# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re Marriage of Baecker*, 2012 IL App (3d) 110660

---

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF A. GARTH BAECKER, Petitioner-Appellant, and TERRY JOAN BAECKER, Respondent-Appellee. |
| District & No. | Third District<br>Docket No. 3-11-0660 |
| Rule 23 Order filed<br>Motion to publish<br>allowed<br>Opinion filed<br>Rehearing denied | December 3, 2012<br><br>December 31, 2012<br>December 31, 2012<br>January 8, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from a dissolution judgment entered a few days after petitioner was convicted for attempting to murder respondent, the appellate court rejected petitioner's contentions that the oral settlement agreement incorporated into the judgment lacked a "meeting of the minds" and that he was under duress and a victim of coercion at the time it was reached, since the only evidence he presented in support of his arguments was that he was in prison and no longer believed the agreement was in his best interests. |
| Decision Under Review | Appeal from the Circuit Court of Tazewell County, No. 10-D-58; the Hon. Jerelyn D. Maher, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Jeffrey M. Dunn (argued), G. Edward Murphy, and Shahzad R. Khan, all of Murphy & Dunn, P.C., of Peoria, for appellant.

Steven A. Wakeman (argued) and Christopher H. Sokn, both of Kingery Durree Wakeman & Ryan, Associates, of Peoria, for appellee.

Panel

PRESIDING JUSTICE SCHMIDT delivered the judgment, with opinion.

Justices Holdridge and McDade concurred in the judgment and opinion.

# OPINION

¶ 1        The petitioner, Garth Baecker, filed a petition for dissolution of marriage in the circuit court of Tazewell County on February 10, 2010. On June 10, 2010, Garth was convicted and sentenced to prison for attempting to kill the respondent, Terry Baecker. On March 23, 2011, the parties indicated that they had reached an agreement in the dissolution proceedings. The trial court read the terms of that oral agreement into the record and instructed counsel to prepare the final judgment. Garth, who was incarcerated in the Dixon Correctional Center throughout the course of this dissolution proceeding, refused to sign the prepared judgment incorporating the oral settlement. On April 19, 2011, Terry filed a motion to enforce the judgment and for entry of final judgment of dissolution. Shortly thereafter, on April 25, Garth filed a motion to vacate the oral settlement and set the matter for trial on all remaining issues. On June 7, 2011, the trial court heard the argument of the parties on their successive motions and entered a final judgment of dissolution of marriage, incorporating into the decree the oral settlement agreement over Garth's objection. There remained some dispute over the sale of Garth's vehicle and the minimum reserve price at which it would be listed for sale. At a hearing on August 18, 2011, on Garth's motion to amend final judgment for dissolution of marriage, to resolve all remaining issues and for entry of final and appealable order, the parties reached an agreement as to the minimum sale price and the court granted Garth's motion with no objection.

¶ 2        Garth appeals, claiming, *inter alia*, that the trial court erred in denying his motion to vacate the oral settlement agreement of March 23, 2011, that the oral settlement agreement was not an enforceable contract for which there was a requisite "meeting of the minds," and that he was under duress and the victim of coercion at the time the settlement was reached. We affirm.

¶ 3                                BACKGROUND

¶ 4        Prior to dissolution and a sordid chain of events, Garth and Terry Baecker had been married for nearly 40 years. Together, they owned and operated the Baecker Agency, agent for Country Financial Insurance.

¶ 5        On the evening of January 24, 2010, Terry confronted Garth regarding a fax she found from Garth's accountant that showed irregular financial activity through their co-owned insurance agency. Specifically, the fax reflected large amounts of interest paid to Garth's clients, as well as a number of promissory notes signed by Garth of which Terry had no knowledge. The couple engaged in a heated argument. On the morning of January 25, 2010, Garth attacked Terry with a wooden club, beating her over the head and striking her multiple times, and then threw her down the stairs of the couple's home. Terry obtained an emergency order of protection in Tazewell County, identified as case number 10-OP-72, that was extended to a plenary order of protection by the Tazewell County circuit court on March 25, 2010. Garth was charged with attempted murder, aggravated domestic battery, violation of an order of protection and escape (he cut off his ankle monitoring device following his arrest). He was convicted on June 10, 2010, and is serving a 16-year sentence in the Dixon Correctional Center.

¶ 6        On March 11, 2010, Country Financial terminated Garth's employment as a Country Financial insurance agent and financial representative. The company removed all of Garth's policies and business documents and cleaned out his office. Country Financial filed suit in the United States District Court for the Central District of Illinois against Garth and the corporation he operated, known as Cityplex Corporation, alleging trademark infringement and multiple counts of fraud. Country Financial sought monetary damages in the amount of $2 million in that suit. On September 28, 2010, an order of default was entered against Garth and Cityplex Corporation.

¶ 7        Terry suffered serious injury and incurred substantial medical expenses as a result of Garth's attack. She filed a personal injury suit against Garth in Tazewell County on June 16, 2010. Garth's counsel in the dissolution proceedings, Murphy & Dunn, drafted an answer to the personal complaint, which Garth then filed *pro se*. Terry filed a motion for partial summary judgment on liability grounds. After appearing in court personally on October 6, 2010, Garth was granted leave to respond to Terry's motion for partial summary judgment. Garth failed to file a response and Tazewell County circuit court judge Michael Brandt granted summary judgment on liability. The case was then set for a hearing on damages on November 18, 2010. Having reviewed the testimony and exhibits provided by Terry, Judge Brandt found in Terry's favor, assessed damages totaling $2,763,470.40 and entered a judgment for the same against Garth.

¶ 8        In the dissolution proceedings, the trial began on February 7, 2011. Following a day of testimony from Terry, the court scheduled two additional days of trial on March 23, 2011, and April 13, 2011. Before the second day of trial was set to start on March 23, counsel for both parties informed the court that an agreement on all outstanding issues had been reached. Terry was present and with counsel, Steven Wakeman. Garth was not present, either for the first day of trial on February 7, or for the March 23 hearing, as he was incarcerated in the

Dixon Correctional Center. Garth waived his presence and was represented at all relevant times by Jeffrey Dunn. The trial court established that Mr. Dunn was in a position to go on the record with the settlement in Garth's absence, and he stated that he had discussed the terms with his client over the phone and received Garth's approval the night before. The terms of the oral settlement agreement were then read into the record.

¶ 9 As Mr. Wakeman outlined for the court, there was a 2009 Mercedes ML-320 automobile that was titled in Garth's name and was to be immediately placed for sale and sold. Initially, Jim Boyd, who operates a used car dealership, was to attempt to sell the vehicle for a period of up to 21 days. It was agreed that from the sales proceeds, the unpaid legal fees of Murphy & Dunn, Garth's attorneys, were to be paid up to $25,000. Any remaining net sales proceeds after the payment to Garth's attorneys were to be the sole property of Terry. It was further agreed that if Mr. Boyd was unsuccessful in his attempts to sell the vehicle, it would be listed, with a minimum agreed reserve price, on eBay. Again, any proceeds from the sale on eBay up to $25,000 would go directly to Murphy & Dunn and any remainder to Terry. Later in the proceedings, Mr. Dunn wanted to make sure everyone was "on the same page with regard to the sale of the Mercedes Benz." He reiterated that the first $25,000 from the sale proceeds would go to Murphy & Dunn in satisfaction of outstanding attorney fees, and if there remained unpaid fees above that amount, they would have to go after Garth directly. Mr. Dunn stated, "[t]hat's his [Garth's] problem. I just want to be very clear on that."

¶ 10 Prior to accepting the agreement as outlined, the trial court ensured that Terry understood its terms, that she had the right to go to trial if she so chose, and that she was voluntarily making the decision to settle all outstanding matters and be bound by agreement. The court admonished Mr. Dunn in a similar fashion, confirming that he did "have the green light to agree" to the settlement, and that Garth was aware of the terms and agreed to be bound by them. Mr. Dunn replied that, as an officer of the court, he had had the opportunity to speak with his client and review the terms of the settlement and that he had received his express approval. The trial court then accepted the oral settlement agreement as part of the record and directed counsel to prepare the judgment of dissolution for the parties to sign by the following Monday.

¶ 11 At some point following the March 23 hearing, Garth indicated that he had changed his mind. On April 19, Terry filed a motion to enforce settlement agreement and for entry of judgment of dissolution of marriage, stating that counsel for Terry had been informed that Garth refused to sign the draft of the judgment of dissolution and the accompanying settlement agreement. Terry requested that the trial court enforce the oral settlement agreement and incorporate it into an order for dissolution of marriage, and that the court direct Garth and his power of attorney, Brad McCollum, to obtain certificate of title on the Mercedes so that it could be transferred in accordance with the terms of the settlement agreement.

¶ 12 Shortly thereafter, Garth's attorneys filed a supplemental petition for interim attorney fees and costs and/or motion to withdraw, followed by a motion to vacate the March 23, 2011, oral agreement. In the petition for interim attorney fees, Garth's counsel alleged that there was an outstanding balance of $20,857.95 for legal services, that Terry was in a superior position to pay, as she had Garth's assets frozen as part of the civil lawsuit/judgment against

him and that she had access to all of the marital assets totaling approximately $1.5 million. At the time this motion was filed, the Mercedes was still titled in Garth's name and had not been sold. In his motion to vacate the oral agreement, Garth argued that one of the main points of emphasis was what was going to happen to the Mercedes ML-320. Specifically, he stated that the parties agreed that he would receive the first $25,000 in sales proceeds to go directly toward his attorney fees, but that it had come to light that said distribution of the payment of his attorney fees was no longer guaranteed. Garth went on to contend that the parties were unable to agree to the minimum reserve price and who would have the authority to accept or reject any offers to purchase. As a result, Garth contended, it was clear that the parties did not actually have any agreement on all necessary terms as of March 23, 2011. Finally, Garth went on to state that at the time he gave his oral approval to counsel, he did not have any of the requisite paperwork in front of him and had to reach a decision within 20 minutes. Garth no longer believed that the agreement was in his best interests or represented an equitable distribution of the parties' marital assets and debts.

¶ 13    A hearing was held on April 29, 2010, on Terry's motion to enter final judgment. Mr. Dunn advised the court that he did not have Garth's authority at that point to sign the final judgment order and that he had filed a motion to vacate to protect his client's interests. Mr. Dunn stated that Garth had approved the settlement the night before it was read into the record, and that they (Murphy & Dunn) thought it was about a "58-42" split of the marital assets; 58% to Terry and 42% to Garth. After hearing argument of the parties, the trial court declined to rule on the motion to enter final judgment and set the matter for hearing on all remaining issues on June 7, 2011.

¶ 14    At the final hearing on June 7, Garth, by and through his attorney, once again argued that the price term on the car was a material element of the contract and there was no meeting of the minds on an essential element of the contract. Garth also argued that the settlement was unconscionable based upon the ultimate division of assets and he only had a short time to make a decision. He posited that he only had 20 minutes on the phone with his attorneys to determine whether or not the settlement was in his best interests and, at the time, he did not have any of the documentation to allow him to make an informed decision. Finally, Garth argued that he was under duress at the time and the settlement was derived as a product thereof. The trial court found that there was nothing before it to indicate that the agreement was unconscionable or the product of duress. Rather, the trial court found that Garth had simply changed his mind. It found that this was not a proper basis to set aside a settlement agreement and, accordingly, enforced the agreement and entered final judgment for dissolution of marriage.

¶ 15    On July 1, 2011, Garth filed a motion to amend final judgment for dissolution of marriage to resolve all remaining issues and for entry of a final and appealable order. This motion alleged, among other things, that the final judgment entered on June 7 did not comport with the provisions of the parties' March 23, 2011, oral agreement. Garth stated that he was to receive all of his Cityplex bank accounts as his nonmarital property, and he was to receive $25,000 from the sale of the Mercedes ML-320 motor vehicle as a contribution toward attorney fees and costs. He specifically argued that at the May 20, 2011, hearing on his petition for interim attorney fees, the court ordered that $35,000 be paid out of his

Cityplex accounts. By paying for interim fees out of the Cityplex account, Garth argued that he did not receive the assets he was entitled to per the March 23 oral agreement. Finally, Garth asserted that there were "blank" spaces in the judgment for dissolution where a minimum reserve price for the vehicle was to be listed; thus, the order was not final and appealable pursuant to Illinois Supreme Court Rule 304 (eff. Feb. 26, 2010).

¶ 16    On August 18, 2011, a hearing was held on Garth's motion, which was granted without objection. The minimum reserve price for sale of the car was set at $25,000 and was agreed to by both parties. Garth's attorneys were to receive $25,000 from the net proceeds of the sale for contribution to their fees, and any amount above and beyond that was to be the sole property of Terry. The judgment was rendered final in all respects with "no just reason to delay enforcement or appeal."

¶ 17    This timely appeal followed.

¶ 18                                    ANALYSIS
¶ 19                                    I. Forfeiture

¶ 20    As an initial matter, Terry alleges that Garth has waived his contract formation and coercion arguments by failing to raise them in the trial court. It is axiomatic that questions not raised in the trial court are waived (forfeited) and may not be raised for the first time on appeal. *Shell Oil Co. v. Department of Revenue*, 95 Ill. 2d 541, 550 (1983). It is required that the points argued on appeal be commensurate with the issues presented at trial. *In re Estate of Leichtenberg*, 7 Ill. 2d 545, 548-49 (1956).

¶ 21    At the trial court level, at both the April 29 and June 7 hearings, Garth argued that he only had 20 minutes on the phone with his attorney to discuss the terms of the settlement. At that time, he did not have a draft of the settlement or the numbers in front of him. Specifically, Mr. Dunn stated at the June 7 hearing that "[b]ut then what happened after the fact is Garth went back to his cell and literally was figuring out the terms of the settlement agreement and came to the conclusion that it was an unconscionable agreement and he felt like he was under duress when he made that agreement and so now he's asking the court to vacate that agreement and for this court to have a full trial on all the remaining issues." Mr. Dunn continued, stating that "there was one point I left out as to our motion to vacate that day when we were in court and read it on the record, not all of the terms of the parties' agreement were agreed upon that day which is evidence as a result of the inability of a final judgment to be tendered to this court because we could not agree on – not necessarily the major details but sufficient details in that there was not a total agreement of the parties."

¶ 22    On appeal, Garth argues that the trial court abused its discretion in enforcing the oral settlement agreement because there was no "meeting of the minds" as to an essential and material element of the contract, and that there was also a "mutual mistake of fact" as to what terms were actually agreed upon. Garth also argues that even if there was an agreement reached that day, the contract is not binding as it was a product of coercion and duress, and its terms were unconscionable.

¶ 23    We believe that these arguments are, in essence, the same. This court has held that "[u]nless they are obvious from the record, the grounds for an objection must be specifically

stated in order to preserve an issue for appeal." *In re Commitment of Hooker*, 2012 IL App (2d) 101007, ¶ 53. While Garth's attorney did not specifically use the phrase "meeting of the minds" in his argument and objection to the entry of final judgment of dissolution, it is obvious that he did argue that an agreement had not been reached that day and, even if it had been, it was unconscionable or derived as a product of his client's duress. Thus, on the record before us, we believe that Garth did properly preserve these issues on appeal.

¶ 24                               II. Oral Settlement Agreement

¶ 25        The State of Illinois encourages the settlement of claims and, to that end, settlement agreements may be oral. *Kim v. Alvey, Inc.*, 322 Ill. App. 3d 657, 669 (2001). "When a party seeks to vacate a property settlement incorporated into a judgment of dissolution of marriage, all presumptions are in favor of the validity of the settlement. [Citation.] A settlement agreement is not typically subject to appellate review because an agreed order 'is a recordation of the agreement between the parties and *** not a judicial determination of the parties' rights.' [Citation.] However, '[a] settlement agreement can be set aside if it is shown that the *** agreement is unconscionable.' [Citation.]" *In re Marriage of Bielawski*, 328 Ill. App. 3d 243, 251 (2002). The determination of whether a valid settlement occurred is in the discretion of the trial court and its decision will not be reversed "unless the court's conclusion is against the manifest weight of the evidence–that is, unless an opposite conclusion is clearly evident." *Webster v. Hartman*, 309 Ill. App. 3d 459, 460 (1999).

¶ 26        It is Garth's position that there is no oral settlement agreement to enforce because on March 23, 2011, there was never a contract or agreement formed. He posits that there was no requisite "meeting of the minds," there existed a mutual mistake of fact in regard to the attorney fees and the sale of the ML-320 Mercedes and that, due to his absence from the hearing, he did not get his day in court. We disagree.

¶ 27        Prior to accepting the oral settlement agreement into the record, the trial court thoroughly admonished Terry of her rights and responsibilities under such an agreement.

"THE COURT: Okay. As to what was stated, are you voluntarily agreeing to that? In other words, has anyone forced you into that agreement that I just heard?

MRS. BAECKER: No.

THE COURT: Has anyone threatened you to make that agreement that we just heard?

MRS. BAECKER: No.

* * *

THE COURT: And you understand what you're to do and what he's to do under the agreement?

MRS. BAECKER: Yes.

* * *

THE COURT: So you're telling me today that you're agreeing to this settlement and you wish to be bound by this settlement? In other words, it's a done deal.

MRS. BAECKER: Yes."

¶ 28    As a corollary, Terry's counsel, Mr. Wakeman, requested that the court make the same inquiries relative to Mr. Dunn, to ensure that he had gone through the terms of the settlement with Garth. Mr. Dunn responded:

> "MR. DUNN: Judge, I went through the terms of this agreement. Obviously he has not seen the physical paperwork that Mr. Wakeman's producing, but the actual terms of this agreement, absolutely, I went through with Mr. Baecker, and he verbally agreed on the phone.
>
> I did not talk to him on Monday when I personally was present there about this, because we did not have this agreement until yesterday night, but I did talk to him on the phone. He was aware of all his assets, all of the potential debts, liabilities, everything in this case. We went through what this agreement is, and he was fine with that.
>
> THE COURT: And I'm just taking you at your word as a representative of the court that you've talked with him and–
>
> MR. DUNN: I have.
>
> THE COURT: –and that he's given you the green light to agree to this?
>
> MR. DUNN: Yes, your honor."

¶ 29    An attorney's statement may bind the client to a settlement agreement when the client later claims to have misunderstood the terms of the settlement (*Sheffield Poly-Glaz, Inc. v. Humboldt Glass Co.*, 42 Ill. App. 3d 865, 868 (1976)), particularly when the settlement is made in open court or in the presence of the client. *Szymkowski v. Szymkowski*, 104 Ill. App. 3d 630 (1982). Mr. Dunn clearly had the authority to bind Garth to the terms of the settlement and did so. Like the trial court, we find *In re Marriage of Clarke*, 194 Ill. App. 3d 248 (1990), illustrative.

¶ 30    In *Clarke*, both the mother, Rebecca Clarke, and father, Tino Antonacci, were represented by counsel. At a pretrial conference on Tino's petition to terminate joint custody and request sole custody, Tino, his attorney and an attorney from the office of Rebecca's attorney met with the court in chambers. *Id.* at 251. Rebecca's attorney withdrew her petition for change of custody and sought increased visitation with the children. In the agreed order that was entered, Tino was awarded sole custody of the three children and Rebecca was given increased visitation. *Id.* At the hearing on Rebecca's motion to vacate, her attorney explained that he was not the usual attorney handling her case and was not familiar with her file. *Id.* He had been instructed to withdraw Rebecca's petition for change of custody and to seek additional visitation. In an accompanying affidavit, however, he stated that he had not been authorized to agree to the change of custody. *Id.* In finding insufficient grounds to vacate the agreed order, this court found that while it was not an agreement reached in open court as in *Szymkowski*, it was also not a purely private discussion between two attorneys. *Id.* at 252-53. Rebecca's attorney had been given instructions, authorized by Rebecca, to withdraw her petition to change custody in her favor. She had conveyed her position and did not attend the pretrial conference. *Id.* at 253. Therefore, this court held that even if there was a misunderstanding as to the change from joint custody, it did not automatically negate her attorney's authority to enter the order that he did. *Id.*

¶ 31    We find that the facts before us here present a stronger case than those in *Clarke* for the

proposition that Garth's attorney had the authority to bind him to the settlement agreement. Unlike in *Clarke*, the agreement in question in the instant case was read onto the record in open court. Both parties were represented by counsel and fully admonished as to the terms of the agreement and their respective responsibilities thereto. The record, as set out above, contains many statements by Garth's counsel that demonstrate that the agreement was acceptable to Garth, that he wished to proceed, and that he knew he had the alternative of proceeding to trial. Garth's numerous references to his absence during the proceeding are inconsequential. As the trial court rightfully pointed out, this trial was set and came as no surprise. After the first day of trial on February 7, 2011, the trial court set the next date for March 23. This gave Garth and his counsel well over a month to prepare a writ or similar request, which would have allowed him to be transported from Dixon Correctional Center to the circuit court of Tazewell County to be present for the hearing. It should be noted that Garth was similarly absent for the first day of trial on February 7. At oral argument, Garth's counsel advised this court that it was Garth's choice to be absent from the proceedings.

¶ 32     Moreover, Garth did not provide the court with any affidavit or evidence to refute the apparent authority that Mr. Dunn had to settle on his behalf. Garth only stated in subsequent pleadings that he "no longer believes that the March 23, 2011 agreement is in his best interests or is an equitable distribution of the parties' marital assets and debts." This change of heart has no bearing on our decision, as "[a] court should not set aside a property settlement agreement merely because one party has second thoughts." *In re Marriage of Steichen*, 163 Ill. App. 3d 1074, 1079 (1987). Accordingly, we find that the trial court's finding that a valid settlement occurred on March 23, 2011, was not against the manifest weight of the evidence and, therefore, the trial court properly denied Garth's motion to vacate.

¶ 33                    II. Meeting of the Minds and Mutual Mistake of Fact

¶ 34     Having established that there was, in fact, an oral agreement reached, and that Garth's attorney had the requisite authority to bind him to that agreement, we will address Garth's next contention that there was no "meeting of the minds" or there existed a mutual mistake of fact that would warrant setting aside the agreement.

¶ 35     Garth's entire argument in this context focuses on the attorney fees that were to go to Murphy & Dunn. The following is the pertinent excerpt from the March 23 proceedings:

> "MR. WAKEMAN: There is also a 2009 Mercedes ML-320 automobile presently titled in the name of Garth Baecker. That vehicle is to be immediately placed for sale and sold. Initially, we're going to allow Jim Boyd, who operates Court Street Park and Sell, to attempt to sell that vehicle for a period of up to 21 days. From the sales proceeds, the unpaid legal fees of Murphy & Dunn will be paid from the net sales proceeds, up to $25,000. Any remaining next sales proceeds after payment of those attorney's fees will be the property of Terry Baecker free and clear of any interest of Garth.
>
> If Mr. Boyd has been unsuccessful in selling the car within that 21 day period, then we will attempt to list it, with some minimum agreed reserved price, that will attempt to sell it through eBay at some mutually agreed price. Again, the balance of any additional

-9-

net sales proceeds after the payment of Murphy & Dunn's legal fees, capped at $25,000, are to be the sole and separate property of Terry Baecker.

* * *

MR. DUNN: With regard to–I want to make sure we're all on the same page with regard to the sale of the Mercedes Benz. Any amount over the $25,000 that we're owed, we collect from Garth, but the first $25,000 would come to us as the payment of at least something towards the attorney fees that we're owed.

MR. WAKEMAN: Anything above the 25 goes to Terry.

MR. DUNN: Did I say Garth? The first $25,000 comes to us as satisfaction of our outstanding attorney's fees owed. Anything above that $25,000, we have to go after Garth for. That's his problem. I just want to be very clear on that."

¶ 36   Contrary to what Garth would have us believe, there was a meeting of the minds at the March 23 hearing, and his argument that the parties did not have an agreement on the issue of how the fees would be paid and the source from which they would be paid is disingenuous. There were no uncertain terms. The car would immediately be placed for sale with Jim Boyd, and, in the event it could not be sold, it would be placed on eBay with a mutually agreed upon minimum reserve price. The minimum reserve price was to ensure that if an offer of $1 or a similarly nominal amount was made, the parties would have the authority to reject it. There was even discussion at subsequent hearings as to the blue book value of the car; it was somewhere in the range of $30,000 to $35,000. Furthermore, it is clear from the transcript of the August 18 hearing that the provisions in draft agreement crafted on June 7 inadvertently left blank the amount Garth was to receive from the sale. At all times, the parties had clearly agreed that Garth's attorneys would receive $25,000 from the net proceeds of the sale and any remaining amount would go free and clear to Terry.

¶ 37   Garth's counsel also argues that the draft of the final judgment submitted to the trial court on the day of the final hearing had material terms left blank; thus, there could not have been a meeting of the minds and similarly no contract. Those "material terms" were the minimum reserve price of the car and the amount Murphy & Dunn was to receive from the proceeds of the sale. First, there was never any dispute that Murphy & Dunn would get the first $25,000 of the proceeds from the sale of the car. As the record indicates, all parties agreed to this, and the court believed that they inadvertently left out the dollar figure. As for the minimum reserve price, the oral agreement indicated that the parties would decide on a mutually agreed-upon reserve price. The fact that it was left blank in the final judgment entered on June 7 does not render the complete agreement null and void. See *First National Bank of Oak Lawn v. Minke*, 99 Ill. App. 3d 10 (1981) (finding that a contract must be clear, definite and complete in all of its material provisions to be enforceable, but lack of nonessential details will not render the contract unenforceable). Perhaps more importantly, Garth filed a motion to amend the June 7 order, requesting that the trial court modify the order to fill in the blanks and reflect the specific terms of the March 23 oral agreement, *i.e.*, that Garth was to receive $25,000 from the net proceeds of the sale of the Mercedes. This motion was granted by the trial court, *without objection*, on August 18, 2011. Garth clearly received what he bargained for–a definite price term on the sale of the vehicle.

¶ 38     We also take note of the fact that it was Garth's own uncooperative attitude that led to the issue with the car in the first place. The Mercedes was titled in his name; his power of attorney, Brad McCollum, was to handle the certificate of title so that Jim Boyd could list the vehicle for sale on his lot. As evidenced by Terry's subsequent motions regarding the sale of the car and motion to compel the delivery of the car, both Brad McCollum and Garth refused to sign the documentation necessary to facilitate the transfer and sale of the vehicle. For Garth to turn around and argue to this court that the car has yet to be listed for sale is duplicitous, as he was clearly the roadblock preventing the sale.

¶ 39     Notwithstanding the above analysis, we note that the issue regarding the Mercedes is now moot, as the vehicle was sold subsequent to the filing of the parties' appellate briefs. Garth's attorneys received $25,000 from the sale of the car as agreed upon, and the argument that this issue reflected that there was no "meeting of the minds" in regard to the sale of the car is moot.

¶ 40                    III. Unconscionability and Duress

¶ 41     A marital settlement agreement is unconscionable if there is "an absence of a meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." (Internal quotation marks omitted.) *In re Marriage of Steadman*, 283 Ill. App. 3d 703, 709 (1996) (quoting *In re Marriage of Carlson*, 101 Ill. App. 3d 924, 930 (1981)). The fact that an agreement "merely favors one party over another does not make it unconscionable." (Internal quotation marks omitted.) *In re Marriage of Gorman*, 284 Ill. App. 3d 171, 181 (1996) (quoting *In re Marriage of Hamm-Smith*, 261 Ill. App. 3d 209, 220 (1994)). "To rise to the level of being unconscionable, the settlement must be improvident, totally one-sided or oppressive." *Gorman*, 284 Ill. App. 3d at 182. Duress may make an agreement between spouses unconscionable. *In re Marriage of Richardson*, 237 Ill. App. 3d 1067, 1082 (1992). "Acts or threats must be legally or morally wrongful to constitute duress [citation], and duress is measured by an objective test, rather than a subjective one [citation]." *In re Marriage of Tabassum*, 377 Ill. App. 3d 761, 775 (2007). "The person asserting duress has the burden of proving, by clear and convincing evidence, that he was bereft of the quality of mind essential to the making of the contract." *In re Marriage of Hamm-Smith*, 261 Ill. App. 3d 209, 215 (1994). We review a trial court's finding of duress under a manifest weight of the evidence standard. *Wermers Floorcovering, Inc. v. Santanna Natural Gas Corp.*, 342 Ill. App. 3d 222, 224 (2003).

¶ 42     Garth contends that this agreement was unconscionable for a myriad of reasons, most notably that he only had 20 minutes on the phone with his attorney to make a decision, that he was not present for the oral settlement agreement, and that he later decided the terms of said agreement did not represent a fair and equitable division of the parties' marital assets. In support of that contention, Garth cites to *In re Marriage of Moran*, 136 Ill. App. 3d 331 (1985), and *In re Marriage of Perry*, 96 Ill. App. 3d 370 (1981).

¶ 43     In *Moran*, the appellate court vacated the property settlement agreement incorporated into the dissolution decree "because of the misrepresentation, duress and coercion practiced upon Marianne." *Moran*, 136 Ill. App. 3d at 336. The appellant-wife, Marianne, secured the legal

-11-

services of attorney Rosenberg. Marianne testified that she showed up at Rosenberg's office for a meeting and was shocked to see her husband in the waiting room. *Id.* at 333. At that meeting, Rosenberg presented Marianne with a settlement agreement that he told her to sign, though he had not previously reviewed its terms with her or even discussed with Marianne the assets and liabilities of the parties' marital estate. Furthermore, the record indicated that the trial court misled and coerced Marianne into signing the marital settlement agreement by advising her that she would not be entitled to more than five years of maintenance, and that the agreement was "the best she could do." *Id.* at 338-39. Upon review, this court found that the record established that Marianne had no input into the drafting of the settlement agreement prior to the time it was presented to her on July 12, 1983, and that she continually objected to its contents. *Id.* at 337. Her attorney responded to her objections by saying that " 'she got a good deal' " and that John's (her husband's) attorney was one of the best trial lawyers. *Id.*

¶ 44    We believe *Moran* is so factually distinguishable from the case at bar as to render it inapposite. First, the settlement agreement Marianne was coerced into signing left her with only one significant asset–the marital home. As a result, she was saddled with the substantial mortgage payments. Marianne had been a homemaker throughout the duration of the parties' 27-year marriage. While she did receive a maintenance award, it was temporary in nature and called for a reduction in monthly payments the last two years. By contrast, John was a cardiovascular surgeon with an income of $191,000 in the year the parties divorced. He kept all the remaining assets, including a condo in Chicago, property in North Dakota and Minnesota, and all of his retirement and pension funds. The economic disparity alone was enough to render that property settlement agreement void, let alone the fact that Marianne's own attorney and the trial court misled her into thinking it was the best deal for her.

¶ 45    The type of economic disparity and weakened bargaining power simply does not exist in this case. Garth's attorneys did not force him into settling his case. According to Mr. Dunn, he indicated to Garth that he did, in fact, have a choice as to whether to settle the case or proceed to day two of trial. Garth's attorneys also indicated to Garth at the time that they believed the settlement agreement represented a reasonable division of the parties' assets, with approximately 52% to Terry and 48% to Garth. Based on the facts of this case, we would agree with Garth's counsel–he probably would not get a better day in court. But, note that unlike in *Moran*, the trial court did not once mention Garth's likelihood of loss in an attempt to force him into settling. In fact, the trial court carefully and methodically ensured that it was the parties' intent to settle all outstanding issues via agreement and that Garth's attorney had his express authority to do so.

¶ 46    Later, Garth's attorney argued that "the result of that agreement, when you take into consideration the fact that anything Garth is awarded, that's collectible, Terry will collect, is literally 92% in Terry's favor and 8% in Garth's favor of the overall distribution of marital assets he has." Frankly, this argument defies logic. If we were to follow that stream of consciousness, the end result would be that Terry would be paying herself on the judgment she won against Garth. The fact of the matter is, Terry's personal injury judgment against Garth, for obvious reasons, is not part of the marital estate. However, by shifting more of the marital assets to Garth to offset the judgments against him, we would effectively be shifting

the burden to Terry to pay both of those judgments. The terms of the oral settlement agreement were not unconscionable.

¶ 47     We find Garth's recital of the "horrible" facts against him equally unpersuasive. There is nothing in the record to indicate that Garth was coerced or under duress at the time the agreement was read into the record. The only evidence he has given to support that theory is the fact he is in prison and he no longer believes the terms of the settlement agreement are in his best interests. In the context of duress, it has been held that stress alone does not rise to the level of duress, as stress is common. *In re Marriage of Flynn*, 232 Ill. App. 3d 394, 401 (1992). Furthermore, Garth has not pointed to a single instance of wrongdoing by Terry or her counsel that would rise to the level of coercion or duress. Indeed, in order for a duress claim to pass muster here, Terry must have committed the illegal or immoral act. See *Thompson v. Thompson*, 91 Ill. App. 3d 943, 945-46 (1980) (holding there were no allegations of wrongdoing attributable to the opposing party and therefore there was no coercion).

¶ 48     Accordingly, we find that it was not against the manifest weight of the evidence for the trial court to enforce the oral settlement agreement as it was read onto the record at the March 23, 2011, hearing. To the contrary, we find Garth's arguments lack the slightest scintilla of merit.

¶ 49     CONCLUSION

¶ 50     For the foregoing reasons, the judgment of the circuit court of Tazewell County is affirmed.

¶ 51     Affirmed.