NOTICE

Decision filed 08/26/14. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2014 IL App (5th) 130266

NO. 5-13-0266

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| SALIM AKBANI, | ) | St. Clair County. |
| | ) | |
|     Petitioner-Appellant, | ) | |
| | ) | |
| and | ) | No. 08-D-555 |
| | ) | |
| DONNA S. AKBANI, n/k/a | ) | |
| Donna S. Robbins, | ) | Honorable |
| | ) | Zina R. Cruse, |
|     Respondent-Appellee. | ) | Judge, presiding. |

_____

      JUSTICE GOLDENHERSH delivered the judgment of the court, with opinion.
      Presiding Justice Welch and Justice Stewart concurred in the judgment and opinion.

**OPINION**

¶ 1    Petitioner, Salim Akbani, appeals from a supplemental judgment of dissolution of marriage entered in the circuit court of St. Clair County which *inter alia* confirmed two previous orders of the trial court, the first being a finding that an April 2008 separation and divorce agreement (2008 agreement) entered into between petitioner and respondent, Donna S. Akbani, n/k/a Donna S. Robbins, is binding on the parties, and the second being a finding that a 2010 handwritten agreement (2010 agreement) is not binding on the

1

parties. The 2010 agreement was found unenforceable on the basis that it contained an attorney review clause, which was a condition precedent to the completion of the 2010 agreement, and that condition was not met. The supplemental judgment allocated property and debt between the parties pursuant to the 2008 agreement and resolved the remaining issues between the parties not covered by the 2008 agreement. Both parties filed motions to reconsider. Ultimately, the trial court entered an order granting in part and denying in part each party's motion to reconsider. Petitioner filed a timely notice of appeal. The two issues raised by petitioner in this appeal are: (1) whether the 2008 agreement is enforceable and (2) whether the trial court erred in finding the 2010 agreement unenforceable. We affirm.

¶ 2                                                BACKGROUND

¶ 3     The parties married on October 16, 1998. No children were born or adopted during the marriage. The parties each blame the other for the divorce.

¶ 4     The parties became business partners, opening Gateway Classic Cars in St. Louis in April 1999, and a second classic car business, Streetside Classic Cars, in Charlotte, North Carolina, in September 2005. Petitioner was mainly involved in sales, while respondent handled administrative matters. However, respondent testified that petitioner was "definitely" involved in the day-to-day bookkeeping and accounting of the businesses.

¶ 5     Respondent ultimately spent more and more time at the Charlotte business. According to petitioner, respondent told him she wanted out of the marriage in March 2008. Petitioner claims he was blind-sided by respondent's announcement and tried to

2

persuade respondent to change her mind. He testified he was completely distraught and was willing to give respondent whatever she asked for in order to make her happy and save the relationship. He later learned that respondent was having an affair with Bob Mueller, one of their employees.

¶ 6    On the other hand, respondent testified the parties' marriage was rocky for years, but the final straw for her came in late February or early March 2008, over a proposed business venture. Respondent and petitioner went to lunch at which time he informed her he wanted to build a $20 million project on a seven-acre tract the parties owned. The parties purchased the tract with plans to build a new dealership on it. Petitioner now wanted to build a hotel, convention center, and restaurant on the property and showed respondent plans of his proposal. Respondent wanted no part of this business venture because she thought it was too risky.

¶ 7    According to respondent, petitioner told her if she was not happy in the marriage, she could leave. Respondent testified petitioner always told her that, but by April 2008, she had enough and told him she believed that is what she should do. The parties then discussed how to split up their businesses and assets.

¶ 8    The parties agree respondent drafted the 2008 agreement, which divided most of the parties' assets and businesses, but agree on little else. According to petitioner, respondent went from wanting nothing to wanting everything, and he kept revising the 2008 agreement to meet her demands in the hope of salvaging the relationship. Petitioner claimed he was in denial about the parties' relationship even when the 2008 agreement was formalized on April 14, 2008. He did not realize respondent was serious about the

3

divorce until he came home from a trip in May and found that respondent had taken many items out of the marital residence in O'Fallon.

¶ 9    Respondent testified petitioner drafted the agreement on the day she told him she wanted out of the marriage.  The parties discussed splitting the businesses, with petitioner taking the St. Louis business and respondent taking the Charlotte business.  Respondent testified she did not provide petitioner with any of the language he used in drafting the 2008 agreement and made no changes to the 2008 agreement, except to change typographical and spelling errors.

¶ 10   The 2008 agreement provided, *inter alia*, that respondent would (1) receive the parties' condo in Charlotte, (2) take over the Charlotte business, beginning on May 1, 2008, (3) receive the parties' 2003 Ford Expedition, and (3) receive a $135,000 cash settlement "for the business and personal separation and divorce."  The $135,000 was to be paid in installments, including $75,000 on May 1, 2008, from a then-existing line of credit and thereafter 12 installment payments of $5,000 per month.  The 2008 agreement further provided that petitioner would (1) receive the marital home located in O'Fallon, (2) receive the parties' land at Shafer Airfield, but only after he paid respondent the $135,000 settlement, and (3) take over the parties' St. Louis business and any expenses incurred after April 20, 2008.  The agreement also provided the parties would share equally in the costs of the divorce and the parties would provide for the payment of certain expenses pertaining to the Charlotte and St. Louis businesses, including sharing the employ of Bob Mueller.  Petitioner's exhibit 37 shows that under the terms of the

4

2008 agreement petitioner would receive 40.17% of the marital property and respondent would receive 59.83% of the marital property.

¶ 11   Petitioner signed the agreement on April 18, 2008.   Respondent signed the agreement on April 22, 2008, after petitioner faxed it to her in Charlotte.   In accordance with the 2008 agreement, petitioner filed for divorce on July 10, 2008, citing irreconcilable differences and noting that attempts at reconciliation had failed and further attempts were not in the best interests of either party.   At the same time, petitioner filed a petition for temporary restraining order, requesting an injunction against respondent concerning marital assets.   Respondent took over the day-to-day operations in Charlotte, while petitioner remained in charge of the St. Louis operation.

¶ 12   On January 15, 2009, after a hearing, the trial court entered an order finding the 2008 agreement between the parties was binding on the parties, specifically stating, "[T]he court finds that both parties are capable, financially-knowledgeable, and intelligent regarding the parties' assets prior to signing the Separation and Divorce Agreement in April 2008."   The trial court ordered the parties to comply with the terms of the 2008 agreement.

¶ 13   Unfortunately, this did not end the litigation.  On May 22, 2009, petitioner filed an amended petition for dissolution of marriage, seeking a judgment of dissolution and an order requiring respondent to contribute to marital debts and expenses and to pay temporary and permanent maintenance to petitioner, as well as a determination of each party's nonmarital and marital property and an equitable distribution of each.  On October 29, 2009, respondent filed a petition for rule to show cause, alleging *inter alia* that

5

petitioner failed to pay her the $135,000 cash settlement pursuant to the terms of the 2008 agreement and failed to make mortgage payments on the O'Fallon marital residence, thereby adversely affecting her credit. Respondent sought judgment in the amount of $135,000, plus interest, an order requiring the Shafer Airfield property or the marital home to be placed for sale in order to satisfy the judgment, and temporary maintenance, plus attorney fees and costs.

¶ 14    In May 2010, the parties participated in mediation in an attempt to reach an agreement on all remaining issues. The mediation was voluntary, not court-ordered. The parties' attorneys were not present. The purpose of the mediation was to attempt to resolve issues that the 2008 agreement did not resolve. A retired judge, James Radcliffe, presided over the mediation. At the end of the mediation, a handwritten agreement was signed by both of the parties. That agreement specifically stated, "The above parties, having submitted this matter to mediation, do now agree that their dispute has been compromised and settled on the following terms: Review and consultation with respective attorneys." Thereafter, the 2010 agreement was typed into a 17-page document. Petitioner signed the typed 2010 agreement, but respondent, after consulting with her attorney, refused to sign it and refused to abide by its terms.

¶ 15    Petitioner then filed a motion for declaratory judgment or, in the alternative, to enforce the settlement agreement, seeking to enforce the 2010 agreement. On August 25, 2010, the trial court entered an order finding the review and consultation clause set forth above to be a condition precedent to the completion of the agreement and denying

6

petitioner's motion for declaratory judgment. As a result, the 2010 agreement was found not binding on the parties.

¶ 16 On November 17, 2010, an order was entered which dissolved the parties' marriage, restored respondent's maiden name, provided that both parties waived maintenance, and awarded each party his or her own life insurance policy. All other issues were reserved. A hearing on all remaining issues was scheduled for December 29, 2010.

¶ 17 On that date, a hearing was conducted, after which the case was taken under advisement. On June 8, 2012, the trial court entered a supplemental judgment of dissolution with regard to the disposition of property and debt which remained outstanding. Both parties filed motions to reconsider.

¶ 18 On April 26, 2013, the trial court entered an order granting in part and denying in part each party's motion to reconsider. The judge was a different judge than the one who ruled on the applicability of the 2008 agreement and 2010 agreement. The new judge specifically stated that she would not "second guess[ ]" either the January 15, 2009, or the August 25, 2010, rulings by a different judge and that "neither party owes any additional amount to the other, except the $66,000 judgment against the Petitioner in favor of the Respondent." The trial court struck the findings in paragraphs 16 and 21 of the supplemental judgment and amended other parts, making petitioner responsible for real estate taxes and insurance on the O'Fallon marital residence since 2007. The trial court also found that all other orders not inconsistent with its order remain in full force and

effect and denied any relief requested and not specifically addressed or granted. Petitioner filed a timely notice of appeal.

¶ 19                                    ISSUES

¶ 20                            I.  2008 Agreement

¶ 21    The first issue we are asked to address is whether the trial court erred in finding the 2008 agreement enforceable.  Petitioner contends the 2008 agreement is unenforceable because: (1) he was under duress and not in his right mind at the time he signed it due to the distress caused by respondent's asking for a divorce and he felt pressured into giving respondent everything she asked for in order to give her space and time in which to change her mind and save their marriage; (2) it is unconscionable; and (3) it is based on mutual mistakes of fact.  Respondent replies the trial court did not err in finding the 2008 agreement binding on the parties because the duress experienced by petitioner was nothing more than the normal anxieties and stress anyone undergoing a divorce goes through and certainly did not rise to the level where petitioner was deprived of his free will, the agreement is not unconscionable, and it does not present a mutual mistake of fact.  We agree with respondent.

¶ 22    "Duress has been defined as including the imposition, oppression, undue influence or the taking of undue advantage of the stress of another whereby one is deprived of the exercise of his free will." *In re Marriage of Hamm-Smith*, 261 Ill. App. 3d 209, 215, 633 N.E.2d 225, 230 (1994).  It is generally accepted that "stress is common in dissolution proceedings." *In re Marriage of Flynn*, 232 Ill. App. 3d 394, 401, 597 N.E.2d 709, 713 (1992).  Stress alone does not prove duress.  *Flynn*, 232 Ill. App. 3d at 401, 597 N.E.2d at

8

713. Even the stress of possibly losing custody of a child does not demonstrate that one lacked the ability to make a voluntary decision. See *In re Marriage of Steadman*, 283 Ill. App. 3d 703, 710, 670 N.E.2d 1146, 1151-52 (1996). The person asserting duress has the burden of proving by clear and convincing evidence that he was bereft of the quality of mind essential in making the contract. *In re Marriage of McCaskey*, 167 Ill. App. 3d 860, 865, 522 N.E.2d 300, 303 (1988); *In re Marriage of Riedy*, 130 Ill. App. 3d 311, 314, 474 N.E.2d 28, 30 (1985).

¶ 23 Furthermore, a marital settlement agreement is unconscionable in cases where there is an absence of a meaningful choice on the part of one of the parties combined with contract terms which are excessively favorable to the other party. *In re Marriage of Baecker*, 2012 IL App (3d) 110660, ¶ 41, 983 N.E.2d 104. In order to rise to the level of being unconscionable, a settlement has to be " 'improvident, totally one-sided or oppressive.' " *Baecker*, 2012 IL App (3d) 110660, ¶ 41, 983 N.E.2d 104 (quoting *In re Marriage of Gorman*, 284 Ill. App. 3d 171, 182, 671 N.E.2d 819, 827 (1996)). Such is not the case here.

¶ 24 Petitioner asserts that the loss of his marriage is analogous to the loss suffered in *In re Marriage of Richardson*, 237 Ill. App. 3d 1067, 606 N.E.2d 56 (1992), where the duress on the wife was found sufficient to warrant setting aside a postnuptial agreement as unconscionable. The instant case is distinguishable from *Richardson* for numerous reasons. First, in *Richardson* it was the husband who wanted a divorce and the agreement in question was signed only one week after the wife's father had died. *Richardson*, 237 Ill. App. 3d at 1080-81, 606 N.E.2d at 65. Second, the husband had his

9

counsel find a second attorney for the wife after her first attorney recommended she not sign the agreement. *Richardson*, 237 Ill. App. 3d at 1081, 606 N.E.2d at 65-66. The first attorney was not explicitly terminated, and the second attorney was not aware the wife had previously been represented. *Richardson*, 237 Ill. App. 3d at 1072-73, 606 N.E.2d at 60. The wife never met the second attorney until the meeting during which the agreement was signed, and she was at the meeting under false pretenses, having been told the meeting was for the purpose of exchanging titles between certain properties. *Richardson*, 237 Ill. App. 3d at 1074, 606 N.E.2d at 61. Third, the wife did not receive any letters or a copy of the agreement prior to the meeting and "had no independent knowledge of the assets or liabilities listed on the balance sheet." *Richardson*, 237 Ill. App. 3d at 1074-75, 606 N.E.2d at 61. Finally, the economic circumstances of the parties rendered the contract unconscionable because the wife at most received only 7.55% of the parties' assets and the husband fraudulently misrepresented the parties' main asset of stock as a nonmarital asset in inducing respondent to sign the agreement. *Richardson*, 237 Ill. App. 3d at 1083-84, 606 N.E.2d at 67.

¶ 25 In the instant case, the parties agree that petitioner wrote the 2008 agreement. Petitioner is an astute businessman who was ready to take on a $20 million project. He knew what assets the parties had amassed, and he signed the agreement before respondent. Respondent made no changes to the document, except to correct typographical and spelling errors. The facts of *Richardson* are in no way similar to the facts herein.

¶ 26    After careful consideration of the record before us, we unequivocally believe that the duress petitioner suffered as the result of the parties' marital discord was in no way greater than the stress a party is under when he or she is faced with the possibility of losing custody of a child. The type of stress petitioner faced was no greater than the normal stress caused by a divorce. Likewise, petitioner has failed to convince us that the 2008 agreement is unconscionable.

¶ 27    Under the 2008 agreement, petitioner received the St. Louis business, which even he admitted was making more money than the Charlotte business that was awarded to respondent under the 2008 agreement. Petitioner submitted a spreadsheet in which he claims the actual division of property per the 2008 agreement left him only 17.35% of the marital assets, while respondent garnered 82.65% of the assets; however, petitioner's exhibit 37, submitted during the first hearing, shows he received 40.17% of the parties' assets, while respondent received 59.83% of the assets. Our own review of the record shows that the division of assets is not so "totally one-sided" as to rise to the level of unconscionability necessary to overturn the trial court's ruling. See *In re Marriage of Foster*, 115 Ill. App. 3d 969, 973, 451 N.E.2d 915, 919 (1983).

¶ 28    We are also unconvinced by petitioner's argument that the 2008 agreement is unenforceable because it is based on mutual mistakes of fact. Petitioner argues it is obvious the parties had different understandings about what the 2008 agreement meant and understood its terms differently. For example, with regard to the mortgage on the O'Fallon marital residence, respondent thought the 2008 agreement meant petitioner would take it over completely, while petitioner thought it meant he would pay it only

11

until May 2008. According to petitioner, because the parties were under mistaken notions about what the agreement meant, it is unenforceable.

¶ 29 Whether a mutual mistake of fact has been shown is for the trial court to decide and should not be set aside on appeal unless the trial court's decision is against the manifest weight of the evidence. *In re Marriage of Shelton*, 127 Ill. App. 3d 775, 781, 469 N.E.2d 618, 623 (1984). A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based upon the evidence. *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 106, 658 N.E.2d 450, 461 (1995). A property settlement should not be set aside merely because one of the parties has second thoughts. *In re Marriage of Chapman*, 162 Ill. App. 3d 308, 318, 515 N.E.2d 424, 431 (1987).

¶ 30 Here, the record shows that petitioner took no action to contest the terms of the 2008 agreement until a week before the January 15, 2009, hearing. Between April 2008, when the parties signed the agreement, and January 2009, both parties proceeded as if the agreement was in effect. Respondent moved out of the marital home in O'Fallon, took up residence at the less expensive condo in Charlotte, and took control of the Charlotte business, while petitioner continued to own and operate the more profitable St. Louis business and live in the more expensive O'Fallon residence. Pursuant to the agreement, petitioner filed for divorce in July 2008, alleging irreconcilable differences. Petitioner continued to pay the mortgage on the O'Fallon residence until October 2008, thereby contradicting his own argument that he thought he only had to pay the mortgage until May 2008.

12

¶ 31 The record before us does not show that there was a mutual mistake of fact that would warrant vacating the 2008 agreement written by petitioner. Petitioner's second thoughts about the 2008 agreement he wrote and signed are not enough to set it aside. It is well established that the law favors peaceful settlement of marital dissolution disputes. *Guyton v. Guyton*, 17 Ill. 2d 439, 444, 161 N.E.2d 832, 835 (1959). Accordingly, we find the trial court did not err in finding the 2008 agreement enforceable.

¶ 32                                      II.  2010 Agreement

¶ 33 The second issue raised in this appeal is whether the trial court erred in finding the 2010 agreement unenforceable. Petitioner asserts that respondent's reliance on the attorney review provision in the 2010 agreement is misplaced and the trial court erred in finding it to be a condition precedent to the formation of a binding agreement between the parties. Respondent replies that the trial court correctly ruled that the 2010 mediation did not result in a binding contract. We agree with respondent.

¶ 34 As petitioner points out, the resolution of this issue depends on whether the attorney review provision in the 2010 agreement is a condition precedent to the formation of a binding contract. If the language is ambiguous, then the determination of its meaning is a question of fact, but if the language is unambiguous, then the construction of the alleged contract is a question of law. *Interway, Inc. v. Alagna*, 85 Ill. App. 3d 1094, 1098, 407 N.E.2d 615, 619 (1980). An ambiguity is not created by the fact that, as here, the parties do not agree upon an interpretation. *Groshek v. Frainey*, 274 Ill. App. 3d 566, 569, 654 N.E.2d 467, 470 (1995). Whether a contract is clear or ambiguous is a question of law for the court. *Groshek*, 274 Ill. App. 3d at 569, 654 N.E.2d at 470. As

13

such, we agree with petitioner that our review is *de novo. In re Marriage of Mulry*, 314 Ill. App. 3d 756, 758, 732 N.E.2d 667, 670 (2000).

¶ 35 In the instant case, the attorney review provision is plain and unambiguous in that, as a term of the contract, each party is allowed the opportunity to review and consult with his or her respective attorney. Parties may specifically provide that negotiations are not binding until a formal agreement is executed. *Interway, Inc.*, 85 Ill. App. 3d at 1098, 407 N.E.2d at 618. While petitioner contends the review is a condition subsequent within the offer, we find there is no difference between the instant clause and an attorney approval clause.

¶ 36 In *Groshek*, our colleagues in the First District specifically stated as follows:

"A contract which contains an attorney approval clause is appropriately construed as a qualified or conditional acceptance of the terms of that contract. Invocation of the clause triggers a rejection of the contract and, at times, a counteroffer. See generally 2 Williston on Contracts § 6:13, at 104-18 (4th ed. 1991) (conditional acceptance occurs when a party to an agreement imposes as a condition of the bargain the favorable opinion of his lawyer)." *Groshek*, 274 Ill. App. 3d at 570, 654 N.E.2d at 470.

The purpose of giving such broad latitude to an attorney is to give the parties who may not be sophisticated in such matters a chance to have their attorneys scrutinize the offer prior to final acceptance. *Olympic Restaurant Corp. v. Bank of Wheaton*, 251 Ill. App. 3d 594, 601, 622 N.E.2d 904, 909 (1993).

14

¶ 37 The contested clause in *Olympic Restaurant*, which the *Groshek* court also relied upon, is similar to the clause in the instant case. In that case, the contested provision gave the parties' attorneys the right to " 'review and make modifications.' " *Olympic Restaurant*, 251 Ill. App. 3d at 596, 622 N.E.2d at 906. Here, the clause provides for "[r]eview and consultation with respective attorneys." *Olympic Restaurant* concerned a real estate sale, but the rationale used in deciding the case applies equally here:

> " 'The purpose of such an attorney approval clause is to provide the purchaser or seller with the opportunity of obtaining legal advice with respect to the transaction, and its value lies in the fact that the contract may be canceled upon receiving such advice. Parties to a real estate transaction are entitled to the benefit of the judgment of a trusted counselor, and an approval contingency is designed to accord this right to those who, for some reason, enter into a purchase and sale agreement before reviewing the matter with their attorney [*sic*].' [Citation.]

> We believe this is sound logic and should apply in the present matter. The only reason to have an attorney review clause is to give the parties to a contract, who may not be sophisticated in matters relating to real estate and/or contracts, a chance to have their attorneys scrutinize the offer before final acceptance. In the present matter, if there was no way for the parties to get out of the October 25 contract during the review period, the review clause was meaningless and the attorney review process was a pointless exercise." *Olympic Restaurant*, 251 Ill. App. 3d at 600-01, 622 N.E.2d at 909.

15

Similarly, the parties in the instant case were also entitled to the benefit of counsel prior to making the 2010 agreement binding.

¶ 38 While the parties here are both savvy and sophisticated business owners, there is nothing in the record to suggest they are well versed in divorce matters. Each party was represented by an attorney who concentrates in family law matters. The parties agreed to voluntary mediation in the hope of coming to a final resolution of the remaining matters, but neither agreed to proceed *pro se*. Both parties agreed to the inclusion of the attorney review clause during mediation because neither party's attorney was present at the mediation session where the 2010 agreement originated. A clause was added to the agreement providing that it was subject to review and consultation with respective attorneys. If that clause is not viewed as a condition precedent to the formation of a contract, then it is rendered meaningless and would mean that the parties were ordered to proceed *pro se* even though they both had retained counsel.

¶ 39 Petitioner asserts that in actuality the parties were not mediating during the session where the 2010 agreement was reached, but were creating a binding marital settlement which respondent's lawyer agreed to by agreeing to the mediation. Petitioner's argument is not supported by this record. The parties were involved in an informal, voluntary mediation session. The local rules regarding mediation specifically provide that during mediation "[i]f an agreement is reached in whole or in part, it shall be reduced to writing on the Memorandum of Agreement Form or attached thereto and signed by the parties *and their counsel*, if any, at the conclusion of the mediation." (Emphasis added.) 20th Judicial Cir. Ct.-Annexed Mediation for Civil Cases IV(M) (Oct. 26, 2004). Because

16

neither attorney was present at the mediation, neither attorney signed the 2010 agreement. By local rules, this was a nonbinding agreement.

¶ 40   During oral argument, petitioner's attorney specifically asked this court for guidance with regard to future cases in which parties seek to reach a marital settlement agreement via mediation.   The guidance we offer petitioner's attorney is simple: be consistent.   Represented parties cannot agree to proceed *pro se* and then include an attorney review clause in their mediation agreement.   If the mediation session is truly meant to result in a binding marital settlement agreement, the parties should specifically state they are agreeing to proceed *pro se*, and an attorney review clause should not be included in the agreement, or counsel should be present, participate, and sign the resulting memorandum.

¶ 41   Finally, we point out that there is no evidence of bad faith in respondent's rejection of the 2010 agreement.   Respondent rejected the 2010 agreement after review and consultation with her attorney within a few days after the mediation session. Respondent's rejection of the 2010 agreement after review and consultation with her attorney means no contract was formed, and, thus, the trial court properly refused to order respondent to sign the 17-page marital settlement agreement which was prepared after the mediation session.

¶ 42                                    CONCLUSION

¶ 43   For the foregoing reasons, we hold that the trial court did not err in finding the 2008 agreement to be binding, but that the 2010 handwritten notes which were later turned into the 2010 agreement were not.   We do not agree with petitioner that it is

17

inequitable to hold him to the 2008 agreement, but not hold respondent to the 2010 agreement. The 2010 agreement contained an attorney review clause not present in the 2008 agreement. Accordingly, we affirm the judgment of the circuit court of St. Clair County in its entirety.

¶ 44    Affirmed.

2014 IL App (5th) 130266

NO. 5-13-0266

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| SALIM AKBANI, | ) | St. Clair County. |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| and | ) | No. 08-D-555 |
| | ) | |
| DONNA S. AKBANI, n/k/a | ) | |
| Donna S. Robbins, | ) | Honorable |
| | ) | Zina R. Cruse, |
| Respondent-Appellee. | ) | Judge, presiding. |

_____

**Opinion Filed:**      August 26, 2014
_____

**Justices:**      Honorable Richard P. Goldenhersh, J.

            Honorable Thomas M. Welch, P.J., and
            Honorable Bruce D. Stewart, J.,
            Concur
_____

**Attorneys**      Richard W. Thompson, 120 West Main Street, Suite 116,
**for**          Belleville, IL 62220-0380; Jill Laux Schubert, The Law Offices of
**Appellant**     Jill J. Laux, L.L.C., P.O. Box 1473, O'Fallon, IL 62269
_____

**Attorney**      Daniel J. Grueninger, The Law Office of Daniel J. Grueninger, 424
**for**          South High Street, Belleville, IL 62220
**Appellee**
_____