NOTICE
Decision filed 06/15/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 150153-U

NO. 5-15-0153

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| SHANNON AGEE (n/k/a JORDAN), | ) | Madison County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 11-D-633 |
| | ) | |
| JAMES AGEE, | ) | Honorable Elizabeth R. Levy and |
| | ) | Honorable Clarence W. Harrison II, |
| Respondent-Appellant. | ) | Judges, presiding. |

JUSTICE CATES delivered the judgment of the court.
Justices Wharton and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court did not err in characterizing as marital a personal injury settlement received by James Agee or in ordering James to pay child support on the settlement proceeds. The court did not exceed its authority under the appellate court mandate or abuse its discretion in awarding attorney fees to Shannon Agee. The trial court's order modifying parenting time was not against the manifest weight of the evidence. The trial court's order denying James's request to modify the allocation of parental responsibilities was also not against the manifest weight of the evidence.

¶ 2    The respondent, James Agee, appeals from the judgments of the circuit court of Madison County classifying and distributing the property of the parties, ordering James to pay child support from that order, ordering James to contribute to Shannon Agee's attorney fees, modifying the

1

parties' summer parenting time, and denying James's request to modify the allocation of parental responsibilities. We affirm.

¶ 3                                     BACKGROUND

¶ 4      The parties were married on August 8, 2009. On September 9, 2009, their daughter S.A. was born. James has two children from prior relationships, J.R. born in 2001 and K.A. born in 2003.

¶ 5      On June 23, 2011, Shannon filed a petition for dissolution of marriage and a petition for temporary custody, child support, maintenance, and attorney fees. On January 30, 2012, James filed a counterpetition for dissolution of marriage. On April 12, 2012, the court appointed a guardian *ad litem* (GAL). The parties have been involved in a protracted legal battle since the filing of Shannon's petition.

¶ 6      The trial court heard the dissolution of marriage case on June 4, June 5, June 21, June 25, and October 11, 2012. The evidence presented at the hearings was set forth in detail in this court's order on the parties' prior appeal, *In re Marriage of Agee*, 2013 IL App (5th) 130320-U (*Agee I*). In this order, we will only set forth those facts necessary to the resolution of the appeal currently before us.

¶ 7      At the start of the first hearing on June 4, 2012, the parties made several stipulations regarding the value, and allocation of, some of the nonmarital and marital property, and agreed that each should be barred from claiming maintenance from the other. The parties presented evidence regarding an incident that occurred on November 1, 2011. On that date, Shannon arrived at James's home after work to pick up S.A. The parties agree that an argument erupted during the exchange, although they presented vastly different versions of events. James asserted that Shannon "plowed into [him]" with her car during the argument, injuring his right knee. Shannon denied

2

hitting James with her vehicle. Officer Pickerell testified that he responded to a call to James's residence on the day of the incident and saw no sign of injury to James's knee. Officer Pickerell also interviewed James's neighbor and Shannon. After completing his investigation, Officer Pickerell concluded that he could not determine whether James was struck by Shannon's vehicle.

¶ 8    James testified that after the November 1, 2011, incident, he had to have surgery on his right knee. James stated at trial that he incurred approximately $40,000 in medical bills for his right knee surgery, and that those bills had been submitted to both his health insurance provider and Geico Insurance Company, Shannon's motor vehicle insurer.

¶ 9    Shannon presented evidence that her gross monthly income from her employment was $3375.97, and her net monthly income was $2764.60. Shannon reported that her monthly expenses were $1700 for herself and $1318 for S.A., for a total of $3019. Shannon testified that her aunt and uncle had loaned her $43,000 to pay her attorney fees, and that she pays them $200 per month toward this loan. Shannon also took out a $2000 loan from her 401(k) plan to pay her attorney fees, on which she owed $1100 as of the date of trial.

¶ 10    On his financial affidavit, James reported that his monthly income was zero, and his monthly expenses were $3994. James previously worked at Express Scripts earning approximately $38,000 per year, but was terminated from his position in December 2011. Marilyn, James's grandmother, testified that she gave James a Toyota 4Runner for his birthday, and that she loaned him money for his attorney fees. Marilyn testified that she gave James between $70,000 and $80,000 during the parties' marriage and after their separation. Ellyn, James's mother, testified she had given James more than $54,000 for attorney fees and living expenses since the parties separated. James testified that he had received approximately $60,000 collectively from his mother and grandmother since the separation. James stated these were loans which he was expected to pay

3

back after he returned to work. After the final hearing on October 11, 2012, the trial court took the matter under consideration.

¶ 11    In December 2012, while the trial court had the case under advisement, Shannon filed several motions seeking to reopen discovery, to reopen the evidence, to supplement the record, and for directed verdict, with regard to funds James received from Geico as settlement of all claims arising from the alleged November 1, 2011, incident. Shannon asserted that the court had not heard evidence as to whether James's medical bills had been paid by insurance, whether there were any surplus funds after the payment of James's medical expenses and attorney fees, and, if there were surplus funds, the amount of those funds. In her motions, Shannon asserted that any excess funds were marital property. The trial court did not address Shannon's motions.

¶ 12    On May 31, 2013, the trial court entered the judgment of dissolution of marriage. The court awarded Shannon sole custody, care, and education of S.A., and established a visitation schedule. The visitation schedule provided for the parents to receive alternative week-to-week visitation in the summer. In awarding Shannon sole custody, the court found all of the relevant factors favored Shannon, including that (1) Shannon was S.A.'s primary caregiver, (2) there was credible evidence that James exhibited anger issues and abusive conduct toward Shannon and others, (3) James was attempting to alienate S.A. from Shannon, including telling S.A. that Shannon did not love S.A., and that James hoped Shannon would die so that he and S.A. could be happy, and (4) Shannon was more capable of facilitating and encouraging a relationship between S.A. and the other parent.

¶ 13    The court found James voluntarily lost his job by not returning to work after his sick leave was expended, and that he did not supply the court with any credible information regarding his alleged job prospects. For child support purposes, the court imputed $2500 in monthly net income to James and ordered James to pay $500 per month in child support commencing on June 15, 2013.

James was also ordered to pay one-half of all expenses for uncovered medical and dental expenses, day care expenses, and extracurricular activities.

¶ 14 The order also divided the parties' property and debt. The court awarded James the marital home, which the parties had agreed was valued at $87,750, with an outstanding mortgage in the amount of $87,391. Shannon was awarded her nonmarital vehicle, and the parties' 2008 Chevrolet HHR, which had an estimated value between $5500 and $12,635 and an outstanding balance due of $5100 to $5269. James was awarded his nonmarital vehicle, and the 2007 Toyota 4Runner valued between $19,000 and $22,000, which had no debt against it. James was also awarded a Harley-Davidson motorcycle, with an outstanding debt of $8051.86 and a value between $9000 and $12,000.

¶ 15 The court awarded Shannon her 401(k), which included $9034 in nonmarital funds and $11,498 in marital funds. Shannon was assigned the loan she took against her 401(k), which had an outstanding balance of $1158. Shannon was also awarded approximately $450 in stocks, which the parties stipulated was marital property. The court awarded James the value of his 401(k), $5387, which was marital property that James withdrew after the parties' separation. The court also divided the parties' household furniture and furnishings, and the parties' income tax returns for tax years 2010 and 2011. The court ordered Shannon to pay approximately $800 in debt and James to pay approximately $5531 in debt.

¶ 16 With regard to the Geico settlement, the court awarded James the proceeds and ordered him to pay 20% of the net proceeds to Shannon as child support. In doing so, the court did not determine the net amount received by James or classify the proceeds as either marital or nonmarital property. The court also found there were discovery abuses that resulted in Shannon incurring

5

additional attorney fees, and ordered James to pay $1250 toward Shannon's fees and 80% of the outstanding GAL fees.

¶ 17    James appealed, and Shannon cross-appealed. In the first appeal, the parties raised issues related to custody, child support, interim attorney fees, and the distribution of the property and debt. This court affirmed the trial court's judgment awarding Shannon sole custody, imputing income of $2500 to James, and setting child support at $500 per month. *Agee I*, 2013 IL App (5th) 130320-U, ¶ 147. This court found that the trial court erred in failing to determine how much James received from the Geico settlement, and in failing to classify the settlement funds as marital or nonmarital property. *Agee I*, 2013 IL App (5th) 130320-U, ¶¶ 134, 147. The case was remanded to the trial court for classification of the settlement funds and reconsideration of the issues of the distribution of marital property, child support from the settlement proceeds, interim attorney fees, and the attorney fees award. *Agee I*, 2013 IL App (5th) 130320-U, ¶¶ 134, 139, 143-147.

¶ 18    On July 25, 2014, the trial court held a hearing on the issues on remand. At the hearing, James testified that he never filed a lawsuit against Shannon for injuries related to the November 1, 2011, incident. Evidence was presented that in June 2012, Geico issued a "Medical Payment" of $5000 related to the November 1, 2011, incident. After costs and the payment of two outstanding medical liens, James received a payment of $3903.71.  On November 5, 2012, Geico issued an additional settlement payment of $62,500. After deductions for medical bills and liens, costs, and attorney fees, James received a check for $30,760.83. Between the two payments, James received net proceeds totaling $34,664.54. On November 13, 2012, James signed a release of all claims against Shannon and Geico related to the November 1, 2011, incident, in which Shannan and Geico denied all liability for the alleged incident.

6

¶ 19    James also testified that the medical bills he incurred prior to the settlement were paid but that additional bills incurred after that time had not been paid. James testified that he had copies of the unpaid bills, but indicated that he had not provided them to Shannon during discovery. The trial court ruled that it would not consider the medical bills incurred after the settlement.

¶ 20    Shannon testified that between June 21, 2011, and May 16, 2012, her bank deposits totaled $55,671.55, or an average of $4970.14 per month. Shannon testified these funds were from her income from work, from a loan she took out from her 401(k) to retain an attorney, and from loans from her aunt to pay attorney fees.

¶ 21    The evidence was that Shannon had paid $47,103.90 in costs and fees to her current attorney for representation up until the time of the May 2013 judgment of dissolution. Shannon testified that she borrowed approximately $45,000 from her aunt in order to pay her attorney fees, and that her payments on this loan were $200 a month. Shannon testified that James's unwillingness to turn over his financial documents during discovery required her attorney to seek trial court orders to compel their production, which caused Shannon to incur additional fees.[1] Shannon testified that James has not reimbursed her for his portion of S.A.'s health insurance premiums, had not provided her half of the income tax returns as ordered, and had not given her any of the personal property that she was awarded in the dissolution. Shannon requested that the court order James to contribute $30,000 toward her attorney fees and to pay her $10,000 to equalize the property distribution.

¶ 22    The evidence at the hearing also showed that James's bank deposits between June 2011 and May 2012 totaled $74,752.09, or an average of $6143.91 per month. Ellyn Agee, James's

---

[1]On August 7, 2014, Shannon's attorney filed an amended attorney fee affidavit indicating Shannon had incurred $3555.05 in fees for the work her attorney performed litigating the issues on remand.

7

mother, testified that she had loaned James approximately $165,000 for his living expenses and attorney fees. James acknowledged at the hearing that he had not produced an itemized list of the funds he received from his family as ordered by the court but testified that any money he received was a loan and not a gift.

¶ 23     On October 20, 2014, the trial court entered an order finding that after the payment of medical expenses, costs, and attorney fees, James received $34,664.54 from Geico as the net amount for his personal injury settlement related to the November 1, 2011, incident. The court found the settlement proceeds were marital property because they were accrued during the marriage and James failed to establish that the proceeds were nonmarital. The court found James had failed to provide any evidence to contradict a finding that the surplus $34,664.54 in settlement proceeds were not for lost income or additional medical costs. The court also found that James did not substantiate his previous claims that he owed approximately $40,000 in additional medical costs. The court ordered James to pay 20% of the proceeds, or $6932.91, plus statutory interest, to Shannon as child support.

¶ 24     After considering the statutory factors in section 503(d) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/503(d) (West 2014)), the court found that the Toyota 4Runner and the motorcycle, which James acquired after the parties' separation, were marital property. The court found that Shannon's contribution to these assets were negligible and awarded Shannon $5000 for her share of this marital property.

¶ 25     The court denied Shannon's request for interim attorney fees. After considering the allocation of the marital and nonmarital property, the available income and access to money of each party, and each party's debts and expenses, the court awarded Shannon $20,000 in attorney fees, plus statutory interest. The court found these fees were in addition to the $1250 in fees, plus

statutory interest, that were awarded in the original judgment of dissolution. In making the award, the court specifically found that the testimony given by James that the funds he received from his parents were loans was not credible, and concluded that these transfers were gifts. The court also ordered James to contribute $3000 toward those attorney fees Shannon incurred litigating the issues on remand. The court also found that James had received substantial sums from his family that far exceeded his previous income and the income earned by Shannon. The court ordered that all other provisions of the judgment of dissolution not specifically modified remained in full force and effect. On November 19, 2014, James filed a motion to reconsider and requested that the court make a finding under Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010) that the order was a final order subject to enforcement or appeal.

¶ 26    On March 24, 2015, after a hearing, the court entered an order denying James's motion to reconsider. The court also entered a finding that the October 20, 2014, order was a final order and, although there were other unrelated matters pending, there was no reason to delay enforcement or appeal of the order. On April 23, 2015, James filed an appeal of the court's October 20, 2014, and March 24, 2015, orders pursuant to Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010). On May 15, 2015, the parties filed a joint motion to stay the appeal, which this court granted. For more than five years, while the appeal was stayed, the parties continued to litigate the allocation of parental responsibilities and parenting time.

¶ 27    On May 29, 2018, the court-appointed GAL filed his 26-page report and recommendations regarding the proposed modifications to parenting time and parenting responsibilities with the court. In making his recommendations, the GAL considered the current circumstances of the parties and their relation to the original judgment of dissolution and this court's order in *Agee I*. To prepare his report, the GAL interviewed both parties, S.A., James's mother, and Shannon's

9

fiancé, Jamie. The GAL conducted a home visit of Shannon's residence but reported that James denied his request to conduct a home visit. The GAL noted that the parties were not able to get along for the benefit of the child. The GAL opined that James had "gone to great lengths toc continue a battle with [Shannon] over the child" and that the "child has suffered, substantially, because of the action of [James]." The GAL reported that James videotapes S.A. in some situations "with the goal being to put [Shannon] in a difficult situation," which frustrates and upsets S.A. The GAL indicated that both parents loved S.A., but that James's dislike and desire to control Shannon overrode his decisions. The GAL repeatedly reported concerns that James was "taking identifiable steps to alienate the child from her mother." The GAL believed that James was discussing the court proceedings and the GAL's interviews with S.A., and that James had directed S.A. on what she should say, both on videotape and during her interviews with the GAL. After assessing the statutory factors used to determine the best interests of the child in allocating parental responsibilities, the GAL recommended that the parenting allocation remain largely unchanged, with Shannon receiving the primary parenting time and decision-making responsibilities, with the exception that the parties should follow the school year schedule for parenting time during the summer. In making this recommendation, the GAL found that Shannon had not demonstrated a "tremendous willingness" to facilitate a close relationship between S.A. and James, but that she had the ability to do so. The GAL believed, however, that James desired to "destroy" the relationship between S.A. and Shannon.

¶ 28    On June 4, 2018, the court held a hearing on all pending motions. These motions included motions seeking modifications of parenting time and support obligations, as well as numerous contempt petitions. Following the hearing, the court entered an agreed-to order. The order set forth certain support arrearages, and a consent judgment in the amount of $27,802.52 was entered

10

against James. The court ordered that all custody exchanges were to occur inside the visitation exchange center (VEC) in Wood River or, if the VEC was closed, at the attached Madison County Sheriff's substation. The order reiterated that Shannon had sole decision-making authority and attendant responsibility to provide information to James. The order established the amount of some of James's support obligations and required the parties to communicate through a third-party website. The court also modified the parenting time schedule, indicating it was reducing James's summer parenting time from the previous week-to-week schedule, to allow James only three uninterrupted weeks of parenting time in the summers of 2018 and 2019. The court indicated this reduction was made in an attempt to compel James to modify his behavior and, if no further contempt petitions were filed and proven prior to the summer of 2020, the court would resume the week-to-week summer schedule. The court also found, pursuant to Illinois Supreme Court Rule 304, that there was no just reason to delay enforcement or appeal of the order.

¶ 29    Following the June 2018 order, the parties continued litigating, filing dozens of motions seeking modifications, clarifications, sanctions, and findings of contempt. In August 2018, James filed a motion to modify his Wednesday night parenting time. In September 2018, the designated VEC, Madison County Kids' Corner, filed a letter and report with the court indicating that the parties were being terminated from the family exchange center program due to James's repeated violation of the center's rules and his continual disrespectful and hostile behavior toward the center's staff. The center's report documented numerous violations between April 2018 and September 2018.

¶ 30    On November 13, 2018, Shannon filed a petition to modify parenting time. Shannon alleged that the parties had been terminated from the VEC due to James's inappropriate behavior during custody exchanges. As part of her prayer for relief, Shannon requested that the court make

11

permanent the summer schedule established in the June 2018 order. On December 14, 2018, the trial court entered an order clarifying the holiday visitation schedule, ordering Shannon to enroll on the third-party child information communication website, and modifying the custody exchange location for James's Wednesday parenting time. The court also set the matter for an evidentiary hearing "on all current pending motions" for February 11, 2018.[2]

¶ 31    On June 4, 2019, James filed a petition for change of "custody/parenting time," asserting there had been a substantial change in circumstances since the entry of the judgment of dissolution of marriage and that a change of custody was necessary to serve the best interests of the child. James requested that he be awarded primary custody and parenting time.

¶ 32    On July 30, 2019, the court entered an order admitting the GAL's May 29, 2018, report and recommendations as to the pending motions, and declining to reappoint the GAL at that time. The court set the case for a hearing on all pending motions, "starting with [the] motion to modify parenting time." The court conducted hearings on the custody and parenting time issues on August 21, August 23, and September 13, 2019. At the start of the first hearing, the court indicated that after the filing of the GAL's May 29, 2018, report, the GAL was discharged and the court entered the June 4, 2018, agreed order in an attempt to resolve some of the outstanding issues. The court stated that the GAL's May 29, 2018, report had been admitted, "pursuant to the agreement of the parties." The court acknowledged its July 30, 2019, order declining to reappoint the GAL. The court indicated that the parties would be focusing on presenting evidence of changes that have occurred since the GAL report was issued and to have the parties present evidence on events occurring after May 2018.

---

[2]This hearing was subsequently reset several times and was eventually conducted beginning on August 21, 2019.

¶ 33    At the hearings, Shannon testified that she and S.A. currently lived in Holiday Shores with her fiancé Jamie and A.M., Shannon and Jamie's two-year-old daughter. Jaime and Shannon have been dating for six years and have lived in the same household for three years. On school days, Shannon drops S.A. off at S.A.'s great-grandparents' home nearby at approximately 7:30 a.m. S.A. reads, does homework, or watches television before the school bus picks her up at 8:15 a.m. S.A. arrives at school shortly before the start of classes at 9:15 a.m. After school, Jamie picks S.A. up from the bus stop and then helps S.A. with her homework. S.A. then plays until Shannon gets home from work between 6 and 6:15 p.m. S.A. has dinner, takes a bath, and then plays or relaxes until she goes to bed. Extensive evidence was presented that on two occasions, due to extenuating circumstances, no one was there to pick S.A. up from the bus stop after school. On both occasions, S.A. went to a neighbor's home and waited for someone to pick her up.

¶ 34    The evidence showed that S.A. has a good relationship with Jamie and is bonded with her sister. S.A. has friends at school and a few other friends in the neighborhood. S.A. has sleepovers with her cousin on the weekends she spends at Shannon's home.

¶ 35    Shannon moved to Holiday Shores in March 2017, and S.A. has been at the same school for two years. S.A. is in the fourth grade, does well in school, and participates in extracurricular school activities. Shannon testified that James is listed as S.A.'s father with the school, and that he receives information directly from the school via the school portal or in a designated folder that is sent home with S.A. Shannon denied the accusations that she withheld the name of S.A.'s school or medical information from James. Shannon also denied preventing James and his family from attending S.A.'s school events or from interacting with S.A. during these events.

¶ 36    Shannon testified that she does not like to communicate directly with James because the interactions are "contentious." Shannon testified that she and Jamie both use the parent

13

communication website to communicate with James, and that she has provided information to her attorney to pass on to James. Shannon acknowledged that she is supposed to provide James with advance notice of any doctor's appointments for S.A., but that she does not always do so. Shannon stated that she provides some advance notice via the parent communication website, and that other times she provided information to James after the appointment.

¶ 37    In April 2018, James's parents relocated from Texas to a small farm in Jerseyville. James lives with his parents, and he and S.A. each have their own rooms in the basement of the home. In addition to numerous pets, the Jerseyville farm has a variety of farm animals which are being groomed as pets for sale. James's father, Michael, testified that they hoped to eventually make a profit on the farm, but that the farm was currently just a fun hobby.

¶ 38    James is employed at his parents' farm as a caretaker for the farm animals. As compensation, James's parents provide his room and board, as well as paying for any other expenses he incurs such as health insurance, car insurance, and gasoline. In the past, this included some of James's child support obligations. Ellyn testified that all of the clothing and toys at her home in Jerseyville were purchased by she and her husband. Ellyn testified that she usually drives James to the custody exchanges, so that James can interact with S.A. during the drive. The evidence was that James does the hands-on parenting while S.A. is in his care.

¶ 39    James testified that S.A. enjoys helping to take care of her pets and the animals on the farm. While in Jerseyville, S.A. is responsible for cleaning her room and putting away her laundry. James presented evidence that S.A. has several friends in the neighborhood, and that other friends from outside the neighborhood visited S.A. in Jerseyville.

¶ 40    James testified that before they each moved, he and Shannon lived approximately 20 minutes away from each other. James estimated that they currently live approximately 35 minutes

14

apart from each other. The evidence was that the schools in Jerseyville are located approximately five minutes from James's parents' home.

¶ 41   James, Ellyn, and Michael regularly attend S.A.'s school events. James testified that he tries to go to most of S.A.'s school events, and that Shannon never goes to these events, asserting that Shannon promises to attend but then fails to appear. Michael testified that Shannon tries to prevent James and his family from interacting with S.A. at school events.

¶ 42   James testified that he always learns about S.A.'s medical appointments after the fact, and that Shannon has never provided him any advance notice about these appointments. James testified that Shannon did not notify him when she moved to Holiday Shores and did not provide him the name of S.A.'s new school until the weekend before her first day. James stated that he met S.A. at the school on her first day because S.A. had to ride the bus and did not know where she was going. James indicated he spoke with the principal that day and filled out some paperwork because S.A.'s teacher stated that Jamie was listed as S.A.'s father.

¶ 43   James testified that S.A. was unable to attend a church function with him last Halloween because Shannon refused to relax the parenting time schedule and insisted that S.A. be returned on time that evening. James stated that Shannon always denies his requests to adjust the parenting time schedule, saying that she either has to work or that she and S.A. have plans. James acknowledged that he had not paid any child support or reimbursed Shannon for S.A.'s health insurance premiums since the prior December.

¶ 44   With regard to the GAL's report and recommendations, James testified that he did not deny the GAL's request to do a home visit, that he had almost no communication with the GAL, and that the GAL lied in his report. James testified that if he had primary custody he would not interfere with Shannon's relationship with S.A., that he would provide her with advance notice of doctor's

15

appointment when practical, and that he would list Shannon as an emergency contact. James stated that a change in custody would allow S.A. to participate in additional activities, such as horseback riding and 4-H.

¶ 45 The parties each presented evidence regarding the ongoing issues related to parenting time and custody exchanges. James acknowledged that the VEC terminated the family from the exchange center program twice due to his alleged misconduct, once in 2014 and again in 2018. James asserted that a conflict in the parenting time order was the reason the VEC terminated him from the program in 2014. James denied receiving a letter explaining his termination from the VEC program in 2018. James indicated, however, that he, S.A., and Michael became ill at the VEC because there was "brown gunk everywhere" and that the trial court's parenting time orders conflicted with the VEC's procedures.

¶ 46 The evidence was that Shannon or Jamie were usually present for the custody exchanges. Shannon testified that there were repeatedly issues with James not following the most recent parenting time order and that James's timeliness was an issue at the exchanges. Jamie testified that James's parents always drive James to the exchange, and that James records every exchange with his cell phone. Shannon testified that she did not believe that James would encourage a close relationship between S.A. and Shannon if James was awarded custody. Shannon testified that she believed that James was always most concerned about his desires, and that he does not consider Shannon's plans with S.A.

¶ 47 The court also conducted an *in camera* interview of S.A., in the presence of the parties' attorneys. During the interview, the court described the interview process to S.A. and told her that the court was going to make the decision of where she lived and went to school. The court asked S.A. about her favorite televisions shows, her pets, and the animals on her grandparents' farm. The

16

court also asked S.A. about her daily routines and about how she spends her time with her parents. The court also asked S.A. about the time she spends with her friends at each parent's home.

¶ 48 After the hearings concluded, the parties continued to file motions regarding parenting time and support issues. On February 27, 2020, the trial court entered an order denying James's request for a change of custody. In the order, the court noted that James's petition to change custody was filed only one year after the most recent parenting order that was entered in June 2018, in contravention of the two-year requirement in section 610.5(a) of the Act (750 ILCS 5/610.5(a) (West 2018)). The court found there was no substantial change in circumstances since the 2018 order, and that there were no changed circumstances necessitating modification to serve the best interest of the child. Based on the parties' motions seeking to modify parenting time, the court also entered a revised parenting plan. The court found, based upon the statutory factors, that it was in the best interests of the child to modify the allocation of parental responsibilities. In the revised parenting plan, Shannon continued to have sole significant decision-making responsibilities and the majority of parenting time. James was given parenting time every Wednesday evening and every other weekend, as well as alternating holidays. The new parenting plan provided that the regular visitation schedule would continue through the summer, with the exception that each parent would receive two one-week, nonconsecutive periods of parenting time, in the summer. On March 9, 2020, James filed a motion to reconsider or, in the alternative, that the judgment be clarified and amended.

¶ 49 On July 27, 2020, the trial court entered another revised parenting plan and an order denying James's motion to reconsider, with the exception of certain agreed-to scrivener's errors and clarifications. The trial court's allocation of significant decision-making responsibilities and

17

parenting time in the July 27, 2020, parenting plan were substantially similar to the February 27, 2020, order.

¶ 50    On August 24, 2020, James filed a notice of appeal of the trial court's July 27, 2020, order, pursuant to Illinois Supreme Court Rule 303(a)(1) (eff. July 1, 2017).[3] On August 28, 2020, this court, on its own motion, ordered James's appeal from the trial court's October 20, 2014, and March 24, 2015, orders reinstated.

¶ 51                                    ANALYSIS

¶ 52                    The October 20, 2014, and March 24, 2015, Orders

¶ 53    James raises four issues as to the trial court's October 20, 2014, and March 24, 2015, orders regarding the property distribution and attorney fees. James argues (1) the trial court erred in finding the personal injury settlement from Geico was marital property, (2) the issue of child support owed from the Geico settlement is moot, (3) the trial court violated the appellate court mandate on remand by reinstating the original $1250 attorney fee award, and by ordering James to pay Shannon $3000 for attorney fees she incurred litigating the issues on remand, and (4) the trial court erred by ordering James to contribute an additional $20,000 toward the attorney fees Shannon incurred prior to entry of the May 2013 judgment of dissolution.

¶ 54            A. Whether the Personal Injury Settlement Was Marital Property

¶ 55    To distribute property upon the dissolution of a marriage, the trial court must first classify the property as either marital or nonmarital property. *In re Marriage of Woodrum*, 2018 IL App (3d) 170369, ¶ 101. The trial court's property classification will not be disturbed on appeal unless the determination is contrary to the manifest weight of the evidence. *Woodrum*, 2018 IL App (3d)

---

[3]James's second notice of appeal indicated he was also appealing from a trial court order entered on March 9, 2020. No such order exists.

18

170369, ¶ 101. The trial court's finding is against the manifest weight of the evidence when the opposite conclusion is clearly evident or where the finding is unreasonable, arbitrary, and not based on the evidence. *Woodrum*, 2018 IL App (3d) 170369, ¶ 101.

¶ 56    Under section 503 of the Act, there is a rebuttable presumption that all property acquired by either spouse after the marriage and before the judgment of dissolution of marriage is marital property. 750 ILCS 5/503(b)(1) (West 2012). The party claiming that the property is nonmarital bears the burden of proving by clear and convincing evidence that the property acquired during the marriage is nonmarital because it falls within one of the exceptions listed in section 503(a) of the Act. *In re Marriage of Heroy*, 385 Ill. App. 3d 640, 670 (2008); 750 ILCS 5/503(a), (b)(1) (West 2012). One of these enumerated exceptions is "any judgment or property obtained by judgment awarded to a spouse from the other spouse." 750 ILCS 5/503(a)(5) (West 2012). Citing *In re Marriage of Baecker*, 2012 IL App (3d) 110660, James argues a settlement of a personal injury claim created by one spouse harming the other should also be excluded from the marital estate, despite the settlement not being reduced to a judgment. We disagree.

¶ 57    In *Baecker*, 2012 IL App (3d) 110660, ¶ 5, the husband beat the wife in the head with a wooden club and threw her down the stairs, after the wife confronted the husband about financial irregularities in their business. Shortly after the assault, the husband filed for a dissolution of the marriage. *Baecker*, 2012 IL App (3d) 110660, ¶ 1. The husband was charged with, and convicted of, attempted murder and aggravated domestic battery. *Baecker*, 2012 IL App (3d) 110660, ¶ 5. After his conviction, but before the judgment of dissolution was entered, the wife filed a personal injury suit against the husband and was awarded a judgment in her favor for over $2.5 million. *Baecker*, 2012 IL App (3d) 110660, ¶ 7. On appeal of the judgment of dissolution, the husband argued that the parties' property settlement agreement did not represent a fair and equitable

19

division of the marital assets because the husband would have to deplete his marital assets in order to satisfy the judgment the wife obtained in the personal injury suit against him. *Baecker*, 2012 IL App (3d) 110660, ¶¶ 42, 46.

¶ 58 The husband in *Baecker*, however, did not argue that the wife's personal injury judgment against him was marital property but instead argued he should receive a larger share of the marital estate so that he could use those funds to satisfy the wife's judgment against him. *Baecker*, 2012 IL App (3d) 110660, ¶ 46. The appellate court correctly rejected the husband's argument as illogical, as it would result in the wife paying herself on the nonmarital judgment she won against the husband. *Baecker*, 2012 IL App (3d) 110660, ¶ 46. Contrary to James's assertions, nothing in *Baecker* supports the proposition that the exception to the presumption of marital property found in section 503(a)(5) of the Act, providing that judgments awarded to a spouse from the other spouse are nonmarital property, should be extended to the personal injury settlement received by James in this case.

¶ 59 The alleged incident occurred, and James received the settlement from Geico, after the parties were married, but before the judgment of dissolution was entered. Thus, there is a rebuttable presumption that the settlement funds were marital property. The record is clear that James did not file suit against Shannon for his alleged injuries, that Shannon has steadfastly maintained that the incident never occurred, and that James released all of his claims related to the alleged incident in exchange for the settlement funds and with full knowledge that Shannon denied all liability. The settlement funds in this case do not fall within one of the exceptions enumerated in section 503(a), and the trial court's conclusion that James failed to present sufficient evidence supporting a finding that the settlement funds were nonmarital property was supported by the record. Based on the

foregoing, the trial court's determination that the personal injury settlement James received from Geico was marital property was not against the manifest weight of the evidence.

¶ 60                B. Child Support Award From the Settlement Proceeds

¶ 61    In the October 20, 2014, order, the trial court ordered James to pay 20% of the net settlement proceeds, or $6932.91, plus statutory interest, to Shannon for child support. In a three-sentence segment in his opening brief, James asserts that the issue of child support owed from the Geico settlement is moot because the June 4, 2018, agreed-to order setting forth certain arrearages in James's support obligations was a "global settlement of the outstanding child support" that was due. James contends "the issue is now moot" because the June 2018 order "included the amounts from the 2014 judgment, and was agreed upon." In his initial brief, James provided this court with no citations to any legal authority or substantive argument and requested no relief.

¶ 62    In response, Shannon contends that the June 4, 2018, agreed-to order has not rendered the October 20, 2014, order awarding her child support from the Geico settlement moot. Shannon argues the June 4, 2018, order was an agreement on all pending motions before the trial court at that time, which did not include child support from the Geico settlement because that issue was then under appeal and had been since 2015. In his reply brief, James expanded on his argument as to why he believes the June 4, 2018, agreed-to order renders the October 2014 child support award moot, and asserts that the June 4, 2018, order was "final" on the question of James's child support arrearages. Alternatively, James argues that if the issue is not moot, this court should remand the issue because the trial court erred by failing to determine what portion of the settlement, if any, was income for the purposes of child support.

¶ 63    Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) provides that the "Argument" portion of the appellant's brief "shall contain the contentions of the appellant and the reasons

therefor, with citation of the authorities and the pages of the record relied on." Rule 341(h)(7) provides that any points not argued are forfeited and cannot be raised in the reply brief, in oral argument, or in a petition for rehearing. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

¶ 64    Here, James's opening brief fails to present any legal "contention" with regard to the October 20, 2014, child support order. James's brief does not provide any citation to relevant authority as required by Rule 341(h)(7) and even fails to request any relief. James's failure to present any argument or any authority in his opening brief violates Rule 341 and results in James's forfeiture of consideration of this issue. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); *In re Marriage of Foster*, 2014 IL App (1st) 123078, ¶ 72. As such, the trial court's October 20, 2014, order awarding Shannon $6932.91, plus statutory interest, for child support from the Geico settlement is affirmed.

¶ 65    C. Whether the Trial Court Violated the Mandate in Awarding Attorney Fees

¶ 66    James raises several claims related to the trial court's award of attorney fees. First, James argues that the trial court violated the appellate court mandate on remand by reinstating the $1250 attorney fee award vacated by this court in *Agee I* and by ordering James to contribute $3000 toward attorney fees Shannon incurred litigating the issues on remand. We find the trial court did not err in entering either of these awards.

¶ 67    The findings of this court are final on all questions actually decided by the court. *In re Marriage of Head*, 273 Ill. App. 3d 404, 408 (1995). When this court remands with specific instructions, the trial court must follow those instructions exactly. *Head*, 273 Ill. App. 3d at 408. When the cause is remanded with general instructions, however, the trial court exercises its discretion to determine what further proceedings are required. *Head*, 273 Ill. App. 3d at 408.

Whether the trial court followed the reviewing court's remand order is a question of law, which is reviewed *de novo*. *Enbridge Pipeline (Illinois), LLC v. Hoke*, 2019 IL App (4th) 150544-B, ¶ 29.

¶ 68    In *Agee I*, this court found that the trial court erred by failing to classify the Geico settlement as marital or nonmarital property. Recognizing that this omission could affect the trial court's division of the marital property which, in turn, could affect the trial court's determination as to attorney fees, this court remanded the case for a redetermination of all of those issues. This court vacated the $1250 award of attorney fees entered in Shannon's favor and remanded the case with instructions for the trial court to reconsider the attorney fee award, to account for the potentially cascading effect of the trial court's error regarding the classification of the settlement proceeds. Specifically, this court remanded "the issue of attorney fees to the trial court to consider in light of the new property and debt distribution." *Agee I*, 2013 IL App (5th) 130320-U, ¶ 147.

¶ 69    Contrary to James's assertion, nothing in *Agee I* suggests that this court believed that the $1250 attorney fee award was not "proper in the first place." This court instructed the trial court to reconsider the issue of attorney fees in light of the new property and debt distribution, which is exactly what the trial court did. For all practical purposes, it does not matter if the trial court "reinstated" the original award of $1250 and awarded Shannon an additional $20,000 in fees or entered an award of $21,250 in fees.[4] James's claim that the trial court violated this court's instructions on remand by reinstating the $1250 fee award from the original judgment of dissolution is without merit.

¶ 70    Next, James argues that the trial court violated this court's instructions on remand by awarding Shannon $3000 in attorney fees for the work performed by counsel litigating the issues

---

[4]In his motion to reconsider, James did not challenge the trial court's authority to "reinstate" the original $1250 fee award but instead challenged the court's order regarding interest on this award. On appeal, James has not raised the issue of interest on this sum.

on remand. On December 27, 2013, after this court's mandate in *Agee I* issued, Shannon filed a petition for interim attorney fees for the fees and costs already incurred in the matter, and for additional expenditures anticipated due to the litigation of the issues on remand. At the July 2014 remand hearing, the court indicated that it was considering only those attorney fees that were incurred up to the May 2013 judgment of dissolution, and those incurred with respect to the issues on remand. James did not raise any objection to the trial court's consideration of an attorney fee award related to the litigation of the issues on remand before, during, or after the July 2014 hearing. On August 7, 2014, Shannon's counsel filed an affidavit with the court stating that Shannon had incurred $3555.05 in fees and costs to litigate the issues on remand, and attached a document detailing the work performed.

¶ 71    On appeal, James contends that the trial court could not award Shannon attorney fees incurred litigating the issues on remand because these fees were "not properly before" the trial court, in that "the fees on remand are not part of the allocation of property *** and were not part of this Court's instructions." James's position on appeal is nonsensical. While he is correct that this court did not instruct the trial court to consider the issue of attorney fees incurred litigating the issues on remand, that issue was never before this court. As the record clearly indicates, the question of attorney fees incurred in litigating the issues on remand was not an issue on appeal in *Agee I*. Thus, it cannot be said that the trial court violated the appellate court mandate by considering an issue not contemplated on appeal, which arose as a result of the parties' ongoing litigation.

¶ 72                    D. The Trial Court's $20,000 Attorney Fee Award

¶ 73    Next, James argues the trial court abused its discretion in ordering him to contribute an additional $20,000 toward attorney fees that Shannon incurred up to the May 2013 judgment of

24

dissolution. Each party has the primary obligation to pay his or her own attorney fees. *In re Marriage of Hamilton*, 2019 IL App (5th) 170295, ¶ 97. The trial court may, after considering the financial resources of the parties, order any party to pay a reasonable portion of the other party's costs and attorney fees. 750 ILCS 5/508(a) (West 2018); *Hamilton*, 2019 IL App (5th) 170295, ¶ 97. The party requesting an award of attorney fees must demonstrate that she is unable to pay the fees and that the other party is able to pay the fees. *Hamilton*, 2019 IL App (5th) 170295, ¶ 97. A party is unable to pay attorney fees if doing so would undermine her financial stability or means of support. *Hamilton*, 2019 IL App (5th) 170295, ¶ 97. Determining whether an award of attorney fees is appropriate requires the court to consider the same factors as those considered in dividing marital property and awarding maintenance. 750 ILCS 5/503(j)(2) (West 2014); *Hamilton*, 2019 IL App (5th) 170295, ¶ 98. The determination of whether to award attorney fees is a matter within the trial court's discretion, which we will not reverse absent an abuse of that discretion. *Hamilton*, 2019 IL App (5th) 170295, ¶ 98.

¶ 74    On June 23, 2011, Shannon filed her petition for dissolution of marriage and a petition for attorney fees. On October 11, 2012, after the final day of trial on the dissolution of marriage, the court entered an order closing the evidence with the exception of allowing the parties to submit affidavits of attorney fees and costs. The parties were given 21 days to file their affidavits and 14 days to file any written objections to the opposing party's affidavit. In the order, the court stated that the "parties waived contribution hearing on fees and costs but not their respective requests for fees and costs from the other party."

¶ 75    On October 25, 2012, Shannon's counsel filed an affidavit with the court setting forth her customary hourly rates for her services and those of her staff. Attached to the affidavit was a 23-page statement of account detailing the services provided between July 11, 2011, and October 23,

2012. The statement indicated Shannon's law firm had provided 194.3 billable hours of work, resulting in $47,103.90 in fees and costs. On November 1, 2012, James's counsel filed an affidavit with the court stating that James had paid $42,425.38 in attorney fees to the law firm. James's counsel did not provide any information detailing the services or the hourly rate provided by counsel or the firm. Neither party filed any objections to the opposing party's attorney fees affidavit. At the July 2014 hearing on remand, Shannon confirmed that she had incurred $47,103.90 in attorney fees and costs up until the time of the May 2013 judgment of dissolution.

¶ 76    On October 20, 2014, the trial court entered an order addressing the issues on remand, including attorney fees. In this order, after considering the overall property allocation, the available income and access to money of each party, and each party's debts and expenses, the court reinstated the $1250 attorney fee award in the original judgment of dissolution and ordered James to contribute an additional $20,000 toward Shannon's attorney fees. In making the award, the court specifically found that the testimony of James and Ellyn stating that the funds James received from his parents were loans was not credible, and the court concluded that these transfers were gifts. The court also found that the substantial sums of money James received from his family far exceeded his previous income and the income earned by Shannon.

¶ 77    On appeal, James contends that the trial court abused its discretion in ordering him to pay a portion of Shannon's attorney fees because the evidence indicated that James did not have the ability to contribute to Shannon's fees, and the court failed to make a finding that the fees were necessary, proper, or properly billed. Before addressing James's primary arguments on this point, we will briefly address James's additional contention regarding Shannon's ability to pay the fees. On appeal, James acknowledges that the record supports a finding that Shannon is unable to pay her fees, yet asserts that Shannon has failed to demonstrate a need for contribution because the

26

loan her aunt made for attorney fees is uncollectible as it did not "survive" Shannon's bankruptcy.[5] James's contention that Shannon's loan from her aunt was discharged in bankruptcy is unsupported by any evidence in the record. Moreover, James never raised this claim in the trial court, and it is deemed waived for purposes of appeal. *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 28 ("It is well settled that a party cannot raise an issue for the first time on appeal, and any issue not raised before the trial court is deemed waived.").

¶ 78    In this case, the record supports the trial court's determination that James had the ability to contribute to Shannon's attorney fees. Between June 2011 and May 2012, Shannon's total bank deposits totaled $55,671.55, or an average of $4970.14 per month. These funds were from Shannon's income from work, from a loan she took out from her 401(k) to retain her first attorney, and from loans from her aunt to pay attorney fees.

¶ 79    During this same period, James's bank deposits totaled $74,752.09, or an average of $6143.91 per month, despite his being voluntarily unemployed. Ellyn, James's mother, testified at the July 2014 hearing that she had given James approximately $165,000 for his living expenses and attorney fees. The trial court found that the money James was provided by his family members were gifts, and that the testimony of James and his mother averring that the monies were loans was not credible.

¶ 80    Furthermore, between the original judgment of dissolution and the judgment on remand, the trial court awarded James the bulk of the marital assets. Shannon was awarded a marital vehicle with approximately $250 to $7500 in equity. James was awarded a marital vehicle and a motorcycle with approximately $20,000 to $25,000 in equity. The court found Shannon's contribution to James's vehicles was negligible but ordered James to pay Shannon $5000 for her

---

[5]Shannon filed for bankruptcy on December 19, 2019.

share of the marital property with respect to these vehicles. Each party was awarded the marital portion of their stocks and 401(k) plans, which was approximately $12,500 for Shannon and $5350 for James. James was awarded the entirety of the $34,664.54 personal injury settlement, minus $6932.91 for child support. Shannon was assigned approximately $800 in marital debts, and James was assigned approximately $5500. After consideration of all offsets and the allocation of the marital debt, James was awarded between $42,500 and $47,300 in marital assets, while Shannon was awarded approximately $16,950 to $24,200 in marital assets. Neither party had significant nonmarital property.

¶ 81    The record demonstrates that Shannon's attorney fees were more than her annual income, and that she did not have the ability to pay her attorney fees. The record also supports a finding that James had the ability to contribute to the payment of Shannon's fees. James had substantially more income than Shannon, and his bank deposits in the year before the entry of the dissolution judgment were almost double what he had previously earned while working. James's family provided him with substantial financial gifts, and he was awarded significantly more of the marital assets. In view of all of the circumstances, we find the trial court did not abuse its discretion in ordering James to contribute an additional $20,000 to Shannon's attorney fees.

¶ 82    Finally, James argues that the trial court erred in awarding Shannon attorney fees because Shannon's attorney did not testify about her work or justify the fees charged. James has waived this claim on appeal.

¶ 83    After the dissolution trial concluded, the trial court ordered the parties to submit their affidavits regarding attorney fees and costs. At that time, the parties waived their right to a hearing regarding contribution, and the court granted the parties an opportunity to file written objections to the opposing party's fee affidavit. Shannon's counsel timely filed an affidavit of attorney fees

28

and a statement of account detailing the fees and costs incurred. James did not file any written objection to the affidavit of Shannon's counsel. James's claim that the trial court erred in ordering him to contribute to Shannon's attorney fee due to her counsel's failure to prove the fees were necessary, proper, or properly billed is deemed waived because he did not raise a timely objection to the fees in the trial court. *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 28 ("It is well settled that a party cannot raise an issue for the first time on appeal, and any issue not raised before the trial court is deemed waived.").

¶ 84                           The July 27, 2020, Orders

¶ 85    With regard to the trial court's July 27, 2020, orders, James argues the court erred in reducing James's summer parenting time in the revised parenting plan, and that the court's order denying this request to modify the parenting allocation was against the manifest weight of the evidence. We disagree.

¶ 86                  A. Reduction of James's Summer Parenting Time

¶ 87    On appeal, James argues the trial court erred in reducing his summer parenting time because (1) there was no motion seeking to modify his parenting time pending before the court, (2) the court failed to make the requisite findings under section 603.10 of the Act (750 ILCS 5/603.10 (West 2020)) that James engaged in conduct that seriously endangered the child's mental, moral, or physical health or that significantly impaired the child's emotional development, and (3) the court's determination that the reduction was in the best interests of the child was against the manifest weight of the evidence.

¶ 88    In the May 2013 judgment of dissolution of marriage, the court awarded Shannon sole custody, or significant decision-making responsibilities, and the majority of parenting time, and established a visitation, or parenting time, schedule. In *Agee I*, this court affirmed the trial court's

custody determination. *Agee I*, 2013 IL App (5th) 130320-U, ¶ 124. Over the years, the parties have filed numerous motions requesting clarifications and modifications of parenting time and related issues.

¶ 89    On May 29, 2018, the GAL filed his report and recommendation related to those pending motions seeking modifications to parenting time and parenting responsibilities. On June 4, 2018, the court entered an agreed-to order addressing certain support arrearages owed by James. The order also sought to clarify and revise parenting time. In that order, the court reduced James's 2018 and 2019 summer parenting time from the week-to-week summer schedule ordered in the May 2013 judgment of dissolution. The revised schedule ordered the parties to follow the school schedule year-round, but granted Shannon one week of uninterrupted parenting time in the summer, and granted James three weeks of uninterrupted parenting time in the summer. The court indicated that it was modifying the summer schedule in an attempt to compel James to alter his behavior and to reduce the "continuing problems during parenting times." The court ordered that "should no further contempt petitions be filed and/or proven regarding misbehavior during parenting time, then the parties shall resume the week-to-week summer schedule in 2020." The court indicated that if a contempt petition was filed and proven prior to the summer of 2020, the court would address the summer schedules for 2020 and beyond in the contempt proceeding.

¶ 90    In September 2018, the VEC terminated the parties from the center's family exchange program due to James's repeated violations of the center's rules and his behavior toward the center's staff. On November 13, 2018, Shannon filed a petition to modify parenting time, alleging the parties had been terminated from the VEC due to James's inappropriate behavior during custody exchanges. Shannon requested that the court make permanent the summer schedule established in the June 2018 order.

¶ 91    On June 4, 2019, James filed a petition for change of "custody," requesting changes to the allocation of both significant decision-making responsibilities and parenting time. On February 27, 2020, the trial court entered an order denying James's request for a change of custody, finding there was no substantial change in circumstances since the June 2018 order, and that there were no changed circumstances necessitating modification to serve the best interests of the child.

¶ 92    The trial court also entered a separate order on February 27, 2020, revising the parenting plan, finding, based upon the statutory factors, that modification of the parenting plan was in the best interests of the child. As in the May 2013 judgment of dissolution, the revised parenting plan awarded Shannon significant decision-making responsibilities and the majority of parenting time. Similar to the June 2018 agreed-to order, the revised parenting plan provided that the regular visitation schedule would continue through the summer, except that it granted each parent two one-week nonconsecutive periods of parenting time in the summer.

¶ 93    James filed a motion to reconsider the February 27, 2020, order or, in the alternative, that the judgment be clarified and amended. On July 27, 2020, the trial court ruled on James's motion to reconsider the February 27, 2020, orders. The court denied James's motion, with the exception of correcting certain agreed-to scrivener's errors and clarifications. The court also entered a new parenting plan with substantially similar provisions as the February 27, 2020, order.

¶ 94    James first argues that the trial court's July 27, 2020, order reducing his summer parenting time was "entered without proper jurisdiction." James contends that the court could only make permanent the restrictions to his summer parenting time found in the June 2018 order under three circumstances: (1) Shannon filed a petition for rule to show cause or motion for contempt concerning James's behavior, and proved her allegations, before the summer of 2020; (2) Shannon filed a petition or motion seeking a restriction of James's parenting time, pursuant to section 603.10

31

of the Act; or (3) Shannon filed a petition or motion seeking a modification of parenting time pursuant to section 610.5 of the Act. James asserts he was not forewarned of the potential restriction to his parenting time because his motion to modify custody was the only pleading on file when the hearings were conducted.

¶ 95    James's factual assertion that there was no pending motion seeking to restrict his parenting time when the court conducted hearings in August and September 2019 is contradicted by the record. On November 13, 2018, Shannon filed a motion to modify the parenting plan, requesting that the court make the June 2018 summer schedule permanent due to James's continued inappropriate behavior during his parenting time. On July 30, 2019, the court set the cause for a hearing on August 21, 2019, on "all pending motions starting with the motion to modify parenting time." Thus, when the trial court entered its orders in February and July 2020, both James and Shannon had pending motions on file which sought  to modify parenting time, in addition to James's motion seeking to modify the allocation of significant decision-making responsibilities.

¶ 96    Alternatively, James argues that the court erred in "restricting" his parenting time because the court failed to make the requisite finding that James engaged in conduct that seriously endangered the child's mental, moral, or physical health or that significantly impaired the child's emotional development. Section 603.10 of the Act provides that if, after a hearing, a court finds by a preponderance of the evidence that a parent engaged in any conduct that seriously endangered the child's mental, moral, or physical health or that significantly impaired the child's emotional development, the court shall enter any such order necessary to protect the child. 750 ILCS 5/603.10(a) (West 2020). This includes, but is not limited to, an order which reduces, eliminates, or otherwise adjusts a parent's decision-making responsibilities or parenting time. 750 ILCS 5/603.10(a)(1) (West 2020).

32

¶ 97    James's position on appeal is that any reduction in parenting time constitutes a restriction of visitation under section 603.10. James, however, has not presented this court with citation to any authority or any compelling argument suggesting that the trial court can *only* reduce a party's parenting time upon a petition or motion to restrict a parent's parenting time filed pursuant to section 603.10. In fact, Illinois courts have held that "not every change or even reduction in visitation time constitutes a 'restriction of visitation' " which must meet the serious endangerment standard. *In re Marriage of Wycoff*, 266 Ill. App. 3d 408, 416 (1994) (finding reduction of weekend visitation from 50 hours to 31 hours, and a reduction of summer visitation from four weeks to two weeks, was not a restriction subject to the serious endangerment standard). Furthermore, section 610.5 specifically provides that parenting time may be modified at any time, without a showing of serious endangerment, upon a showing of changed circumstances that necessitates modification to serve the best interests of the child. 750 ILCS 5/610.5(a) (West 2020).

¶ 98    In this case, the court's July 27, 2020, parenting plan was not an order directed at restricting James's parenting time upon a motion filed pursuant to section 603.10. Instead, the revised parenting plan was an order modifying the allocation of parenting time under section 610.5.

¶ 99    Finally, James's third argument is that the trial court's decision reducing his parenting time was against the manifest weight of the evidence because S.A. would be able to spend more time at home with a parent during the summer under a week-to-week schedule. James argues that it is in S.A.'s best interests to be able to spend additional time at home on James's farm rather than in "alternative care" while Shannon is at work.

¶ 100   The circuit court can modify a parenting plan or allocation judgment pursuant to section 610.5(c) of the Act if (1) a substantial change has occurred since the existing parenting plan or allocation judgment was entered and (2) modification is necessary to serve the child's best interest.

750 ILCS 5/610.5(c) (West 2020);[6] *In re Marriage of Burns*, 2019 IL App (2d) 180715, ¶ 26. A "parenting plan" is a written agreement that allocates significant decision-making responsibilities, parenting time, or both. 750 ILCS 5/600(f) (West 2020). An "allocation judgment" is defined as a judgment allocating parental responsibilities. 750 ILCS 5/600(b) (West 2020). "Parental responsibilities" means both parenting time and significant decision-making responsibilities with respect to a child. 750 ILCS 5/600(d) (West 2020).

¶ 101   Section 602.7 of the Act provides that the court shall allocate parenting time in accordance with the best interests of the child. 750 ILCS 5/602.7(a) (West 2020). In allocating parenting time, the court shall consider all relevant factors including (1) each parent's wishes; (2) the child's wishes; (3) the amount of time that each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities; (4) any prior agreement or course of conduct between the parents relating to caretaking functions; (5) the interaction and interrelationship of the child with his parents and siblings and with any other person who may significantly affect his best interests; (6) the child's adjustment to his home, school, and community; (7) the mental and physical health of all individuals involved; (8) the child's needs; (9) the distance between the parents' residences; (10) whether a restriction on parenting time is appropriate; (11) the physical violence or threat of physical violence by the child's parent directed against the child or other member of the child's household; (12) each parent's willingness and ability to place the child's needs ahead of his or her own; (13) each parent's willingness and ability to facilitate and encourage a close and continuing relationship between the other parent and the child; (14) the occurrence of abuse against the child

---

[6]Section 610.5(e) provides that a court may modify a parenting plan or allocation judgment without showing of changed circumstances in certain limited circumstances. 750 ILCS 5/610.5(e) (West 2020). This provision is not at issue in this case.

or other member of the child's household; (15) whether one parent is a sex offender or resides with a sex offender; (16) the terms of the parent's military family-care plan if a parent is a member of the United States Armed Forces who is being deployed; and (17) any other factor that the court expressly finds to be relevant. 750 ILCS 5/602.7(b) (West 2020).

¶ 102   The trial court's determination regarding the allocation of parenting time is accorded great deference on appeal because the trial court is in the best position to assess the credibility of the witnesses and to determine the child's best interests. *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 15. We will not overturn the trial court's decision absent an abuse of discretion or unless the decision is against the manifest weight of the evidence. *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 15.

¶ 103   In the July 27, 2020, parenting plan, the court indicated that the revised parenting time allocation was based on its determination of the child's best interests after consideration of the evidence and the statutory factors. Before ruling on the parties' motions, the court held two days of hearings, plus an *in camera* interview of S.A., and admitted into evidence the GAL's 26-page report and recommendations. James's truncated argument on appeal fails to provide a comprehensive analysis of the statutory factors or the evidence presented. Thus, we find that James has failed to demonstrate that the trial court's determination regarding the allocation of parenting time is against the manifest weight of the evidence or was the result of an abuse of discretion. Therefore, the trial court's July 27, 2020, parenting order reducing James's summer parenting time is affirmed.

¶ 104          B. Denial of James's Petition to Modify the Parenting Allocation

¶ 105   Next, James argues that the trial court erred in denying his petition to modify the parenting allocation because (1) the trial court employed the wrong standard in assessing his motion and

35

(2) the trial court's findings that there was not a substantial change in circumstances or that modification of the parenting responsibilities was not in the child's best interest were against the manifest weight of the evidence.

¶ 106 The determination regarding the allocation of parental responsibilities is a matter within the sound discretion of the trial court. *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 24. The trial court is in the best position to assess the credibility of the witnesses and to determine the best interests of the child. *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 24. On appeal, this court will not reverse a trial court's determination regarding parental responsibilities unless it is against the manifest weight of the evidence, is manifestly unjust, or results from a clear abuse of discretion. *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 24. We will affirm the trial court's ruling if there is any basis in the record to support the trial court's findings. *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 24.

¶ 107 1. Section 610.5 Standard for Modification

¶ 108 Section 610.5 of the Act allows for the modification of the allocation of parental responsibilities. Section 610.5(a) provides that, unless stipulated to by the parties or as provided under section 603.10 governing the restriction of parental responsibilities:

"no motion to modify an order allocating parental decision-making responsibilities, not including parenting time, may be made earlier than 2 years after its date, unless the court permits it to be made on the basis of affidavits that there is reason to believe the child's present environment may endanger seriously his or her mental, moral, or physical health or significantly impair the child's emotional development. Parenting time may be modified at any time, without a showing of serious endangerment, upon a showing of changed

36

circumstances that necessitates modification to serve the best interests of the child." 750 ILCS 5/610.5(a) (West 2020).

¶ 109   Section 610.5(c) provides that, except in cases concerning the modification of any restriction of parental responsibilities under section 603.10:

"the court shall modify a parenting plan or allocation judgment when necessary to serve the child's best interests if the court finds, by a preponderance of the evidence, that on the basis of facts that have arisen since the entry of the existing parenting plan or allocation judgment or were not anticipated therein, a substantial change has occurred in the circumstances of the child or of either parent and that a modification is necessary to serve the child's best interests." 750 ILCS 5/610.5(c) (West 2020).

Thus, the circuit court can modify a parenting plan or allocation judgment pursuant to section 610.5(c) of the Act if (1) a substantial change has occurred since the existing parenting plan or allocation judgment was entered and (2) modification is necessary to serve the child's best interest. *In re Marriage of Burns*, 2019 IL App (2d) 180715, ¶ 26. As already noted, this provision encompasses modifications to the allocation of both significant decision-making responsibilities and parenting time. See 750 ILCS 5/600 (West 2020) (defining a "parenting plan," "allocation judgment," and "parental responsibilities").

¶ 110   In the May 2013 judgment of dissolution of marriage, the trial court awarded Shannon sole custody, or significant decision-making responsibility and the majority of parenting time, with James receiving parenting time. Over the years, the trial court entered numerous orders related to parenting time, including the June 4, 2018, agreed-to order. In addition to addressing certain support and expense arrearages owed by James, the June 4, 2018, agreed-to order included orders regarding parenting time and, to a limited extent, significant decision-making responsibilities.

37

Specifically, the order addressed custody exchanges, admonished James that Shannon had the sole authority with regard to significant decision-making, admonished Shannon regarding her duty to provide James with notification of healthcare appointments, ordered the parties to communicate about the child through a third-party website, and modified the summer visitation schedule. The order provides that the modifications in the order superseded all prior parenting time orders.

¶ 111   On February 27, 2020, the trial court entered an order denying James's June 4, 2019, petition for change of custody. In the order, the court found that James agreed "to the most recent Parenting Order dated June 4, 2018" and "noted" that James's new petition was filed only one year after the order instead of the two, as prescribed by section 610.5(a) of the Act (750 ILCS 5/610.5(a) (West 2020)). The court also observed that a new trial was conducted and that the parties provided the court with their respective parenting plans. The court found that "[t]ime has only made Father's request worse," and denied James's petition for change of custody, finding "no substantial change (positive material improvement) since the 2018 order. Likewise, there are no changed circumstances that necessitate modification to serve the best interests of the child."

¶ 112   On appeal, James argues that the trial court erred when it entered the July 27, 2020, order denying his request to modify the allocation of parenting responsibilities because the denial was based on a finding that the June 4, 2018, order was an allocation judgment instead of a temporary parenting order. James contends that "[t]his misapprehension then guided the trial court to apply section 610.5(a) of the Act *** rather than 610.5(c) ***, as the trial court noted that before making a finding to modify the allocation, there had to be a substantial positive change at the father's home." James maintains that, "[i]nstead, the onus was to find if there had been enough of a change since the last order that a new parenting plan would serve the best interest of the child" under section 610.5(c). This portion of James's claim has two parts, (1) that the trial court erred in finding

38

that the June 4, 2018, order was an "allocation judgment," and (2) that this erroneous finding caused the trial court to apply the incorrect standard regarding changed circumstances, specifically guiding the court to apply the "standard" set forth in section 610.5(a) instead of section 610.5(c). While we agree with James's contention that the trial court mischaracterized the June 4, 2018, order as an allocation judgment subject to the restrictions in section 610.5(a), James was not prejudiced by the error.

¶ 113   Section 610.5(a) restricts a party from filing a motion to modify "an order allocating parental decision-making responsibilities, not including parenting time," less than two years after its entry, unless the court permits the filing based on affidavits that there is a reason to believe the child's present environment may endanger the child's health or emotional development. 750 ILCS 5/610.5(a) (West 2020). While the June 4, 2018, order modified parenting time and custody exchanges, the order did not make any modifications to the parties' rights regarding significant decision-making responsibilities. As a result, the June 4, 2018, order was not "an order allocating parental decision-making responsibilities" as contemplated by section 610.5(a). As such, the May 2013 judgment of dissolution of marriage was the last order allocating parental decision-making responsibilities, not including parenting time, as contemplated by section 610.5(a).

¶ 114   James's contention that this error by the trial court led the court to apply the incorrect standard in reviewing his petition for a change of custody, however, misconstrues the trial court's order and the applicable law. James asserts that the trial court's mischaracterization of the June 4, 2018, order led the court to apply the "standard" in section 610.5(a) instead of the standard in section 610.5(c).

¶ 115   Section 610.5(a) of the Act is a procedural bar to the filing of a motion to modify an order allocating parental decision-making responsibilities. It does not contain a "standard" by which to

39

assess the merits of the underlying motion. Instead, the merits of all motions to modify are assessed under the standards set forth in section 610.5(c). See *Department of Public Aid ex rel. Davis v. Brewer*, 183 Ill. 2d 540, 554-57 (1998) (interpreting former sections 610(a) and (b), which are substantially similar to section 610.5(a) and (c) respectively and finding that the procedural prerequisites in subsection (a) served as a gatekeeper but that the merits of all motions to modify are assessed pursuant to the provisions of section 610(b), the functional equivalent of section 610.5(c)). Under section 610.5(c), the court can modify a parenting plan or allocation judgment when the court finds, by a preponderance of the evidence, that (1) there has been a substantial change in circumstances since the existing parenting plan or allocation judgment was entered and (2) modification is necessary to serve the best interests of the child. 750 ILCS 5/610.5(c) (West 2020); see also *Brewer*, 183 Ill. 2d at 555. In this case, although the trial court mischaracterized the June 4, 2018, order as an order allocating parental decision-making responsibilities governed by section 610.5(a), James suffered no harm from this error because the court proceeded on James's June 4, 2019, motion without requiring him to satisfy the affidavit requirements found in that section.

¶ 116   James's contention that the court did not assess his motion under the standard set forth in section 610.5(c) is also incorrect. Here, the trial court denied James's petition for change of custody based on a finding there was no substantial change in circumstances and that there were no changed circumstances necessitating modification to serve the best interests of the child. This conclusion is consistent with an application of the standards in section 610.5(c) and a finding that James failed to prove either requirement under that section.

¶ 117   Notably, James asserts that the trial court should have examined whether "there had been enough of a change since the last order that a new parenting plan would serve the best interest of

40

the child." Although phrased slightly differently, the standard proposed by James appears to be no different than that employed by the trial court. James's claim that the trial court applied the wrong standard in assessing his motion to modify custody, or the allocation of parental responsibilities, is unsupported by the record.

¶ 118                    2. Modification Was Not in the Child's Best Interests

¶ 119   James also argues that the trial court's denial of his petition to modify custody was against the manifest weight of the evidence because the court erred in finding there was not a substantial change in circumstances, or that modification of the parenting arrangement was not in the child's best interest. Although James challenges both findings on appeal, we find the second finding dispositive.

¶ 120   The Act provides that the trial court shall allocate parental responsibilities according to the best interests of the child. 750 ILCS 5/602.5(a) (West 2020) (trial court shall allocate decision-making responsibilities according to the child's best interests); 750 ILCS 5/602.7(a) (West 2020) (trial court shall allocate parenting time in accordance with the best interests of the child). As already noted, modifications to the allocation of parenting time and significant decision-making responsibilities are governed by section 610.5 of the Act, which provides that the court can modify a parenting plan or allocation judgment when the court finds, by a preponderance of the evidence, that (1) there has been a substantial change in circumstances since the existing parenting plan or allocation judgment was entered and (2) modification is necessary to serve the best interests of the child. 750 ILCS 5/610.5(c) (West 2020); see also *Brewer*, 183 Ill. 2d at 555.

¶ 121   In determining the best interests of the child when allocating parental responsibilities, the court shall consider all relevant factors, including the enumerated statutory factors. See 750 ILCS 5/602.7(b) (West 2020) (setting forth 17 factors for the court to consider when allocating parenting

41

time); 750 ILCS 5/602.5(c) (setting forth 15 factors for the court to consider when allocating significant decision-making responsibilities). We have already discussed the statutory factors to be considered in allocating parenting time. The statutory factors to be considered in allocating significant decision-making responsibilities include (1) the child's wishes; (2) the child's adjustment to his home, school, and community; (3) the mental and physical health of all individuals involved; (4) the ability of the parents to cooperate to make decisions; (5) the level of each parent's participation is past significant decision-making with respect to the child; (6) any prior agreement or course of conduct between the parents relating to decision-making with respect to the child; (7) the wishes of each parent; (8) the child's needs; (9) the distance between the parents' residences; (10) whether a restriction on decision-making is appropriate under section 603.10; (11) each parent's willingness and ability to facilitate and encourage a close and continuing relationship with the other parent and child; (12) the physical violence or threat of physical violence by the child's parent directed against the child; (13) the occurrence of abuse against the child or other member of the child's household; (14) whether one parent is a sex offender; and (15) any other factor that the court expressly finds to be relevant. 750 ILCS 5/602.5(c) (West 2020). The trial court is not required to make explicit findings on each factor. *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 47. A reviewing court will not disturb a trial court's ruling on the allocation of decision-making responsibilities unless the decision is against the manifest weight of the evidence. *Jameson*, 2020 IL App (3d) 200048, ¶ 47.

¶ 122   James's final contentions on appeal are that the trial court's finding that modification of the parenting allocation was not in the child's best interest was against the manifest weight of the evidence because (1) the court gave the GAL's report and recommendations improper weight, (2) the trial court failed to determine the child's preference regarding custody and parenting time

42

during the *in camera* interview, and (3) the trial court incorrectly weighed the parents' respective inability to foster a parent-child relationship.

¶ 123                    a. Admission and Reliance Upon the GAL's Report

¶ 124   Pursuant to section 604.10, a GAL shall provide a written report to the court and the parties regarding his recommendation as to the best interests of the minor child. 750 ILCS 5/604.10(b) (West 2020). The GAL "shall testify as the court's witness" and is subject to cross-examination at trial. 750 ILCS 5/604.10(b) (West 2020). The GAL's report, however, may be admitted into evidence without testimony from the GAL, unless a party objects to its admission. 750 ILCS 5/604.10(b) (West 2020).

¶ 125   James contends that the trial court's determination that modification was not in the child's best interest was against the manifest weight of the evidence because the court gave the GAL's report and recommendation "improper weight." James also asserts on appeal that he "did not agree to the admission of the report as evidence" and that, even if he did, the report and recommendations were based upon "information that was gathered outside of the imposed relevant time period."

¶ 126   On July 30, 2019, the court entered an order stating that the GAL's May 2018 report and recommendations were "admitted as to the pending motions." The May 2018 report indicates that the GAL's recommendations were based upon the current circumstances in relation to the original judgment of dissolution and this court's order in *Agee I*. At the August 21, 2019, hearing, the court stated on the record that the GAL's report was being admitted into evidence and explained that this was agreed to by the parties. Under the invited-error doctrine, a party may not claim error in the admission of evidence where the admission was procured, invited, or acquiesced to by that party. *Fleming v. Moswin*, 2012 IL App (1st) 103475-B, ¶ 92. The record demonstrates that James

43

consented to the admission of the report into evidence, and he cannot now complain about an alleged error to which he acquiesced.

¶ 127 Moreover, James's contention that the court erred in that it improperly "relied heavily on the father making modifications" from the GAL's report is unfounded by the record. In support of his assertion, James cites to the February 27, 2020, order denying his petition to modify custody, in which the court found that "[t]he situation as described in GAL Drazen's report of May 29, 2018, has only worsened as Father has become more removed from the realty of ordinary adult life." James, however, also acknowledges that the trial court's "decision to rely on the GAL's report as a starting point was correct." James provides this court with no insight into how to reconcile his contradictory positions on appeal or how the trial court's observation that James's position has worsened since the GAL's May 2018 report amounts to giving the report "improper weight." The bulk of James's argument attacks the GAL's findings and the court's decision to admit the report without reappointing the GAL. The record does not indicate that James subpoenaed the GAL to testify at trial so that James could cross-examine the GAL about his report. Instead, James consented to the court's decision to admit the GAL's report at the hearing without reappointing the GAL and, thus, he may not now complain about the trial court's admission, and consideration of, the report. See *Fleming*, 2012 IL App (1st) 103475-B, ¶ 92.

¶ 128                                   b. *In Camera* Interview

¶ 129 The child's wishes are one of the factors the court should consider in determining the child's best interests when allocating parental responsibilities. 750 ILCS 5/602.5(c)(1), 602.7(b)(2) (West 2020). Section 604.10 allows the court to interview the child in chambers to ascertain his wishes as to the allocation. 750 ILCS 5/604.10 (West 2020). The scope of questioning during an

44

*in camera* interview is largely a matter within the trial court's discretion. *In re Marriage of Milovich*, 105 Ill. App. 3d 596, 611 (1982).

¶ 130   On August 23, 2019, the court conducted an *in camera* interview of S.A., in the presence of the parties' attorneys. During the interview, the court described the interview process to S.A. and told her that he was going to make the decision about where she lived and went to school. During the interview, the court asked S.A. about her favorite television shows, her pets, and the animals on her grandparents' farm. The court also asked S.A. about her daily routines and about how she spends her time with her parents on the weekends. The court also asked S.A. about the time she spends with her friends at each parent's home.

¶ 131   James argues that the trial court "failed to apply the directives of section 604.10" by using the *in camera* interview only to obtain information about S.A.'s daily routines, instead of determining her wishes regarding custody. James acknowledges that the trial court was not required to ask S.A. directly what her preference was, and instead asserts that the court erred by failing to obtain "more information" about her preference. Citing *In re Marriage of Wycoff*, 266 Ill. App. 3d 408, James contends that once the court decides to conduct an *in camera* interview, the court must ascertain if the child has any preference regarding custody, and the court's failure to do so constitutes an abrogation of its duties.

¶ 132   While *Wycoff* discusses the role of a child's preference as to custody in the court's assessment of whether modification is in the child's best interest, *Wycoff* does not support the proposition that the trial court has a "duty" to determine a child's preference. In fact, *Wycoff* acknowledges that great care is necessary in conducting an *in camera* interview, and that most judges will not directly ask a child where he wishes to live. *In re Marriage of Wycoff*, 266 Ill. App. 3d at 415. The court observed that such care was necessary because "[i]t is seldom in a child's

45

interest to be asked to choose between his parents or to believe that his expression of preference will influence the judge's decision." (Internal quotation marks omitted.) *Wycoff*, 266 Ill. App. 3d at 415.

¶ 133   Here, the trial court's inquiries about S.A.'s friends, interests, and how she spent her time with her parents were all appropriate. James has not directed this court's attention to any case supporting the proposition that a trial court must determine a child's preference during an *in camera* interview, such that the failure to do so is reversible error. James has failed to demonstrate that the trial court abused its discretion by failing to "obtain more information" about S.A.'s preferences regarding the allocation of parental responsibilities during the *in camera* interview.

¶ 134                    c. Inability to Foster a Parent-Child Relationship

¶ 135   Another factor that the court should consider in determining the best interests of the child when allocating parental responsibilities is the ability of each parent to facilitate a relationship between the child and the other parent. 750 ILCS 5/602.5(c)(11), 602.7(b)(13) (West 2020). In his final subpoint, James argues the trial court's finding that modification of the parenting allocation was not in the child's best interest was against the manifest weight of the evidence because the court incorrectly weighed the parents' respective abilities to foster a parent-child relationship with the other parent. Specifically, James asserts the trial court's decision "blaming" only James for the inability to foster a relationship between S.A. and Shannon is contrary to the manifest weight of the evidence because the record demonstrates that Shannon also failed to foster a relationship between S.A. and James.

¶ 136   This court's disposition of this appeal comes approximately 10 years after Shannon filed her petition for a dissolution of marriage, a marriage that lasted less than 2 years. The parties have

46

litigated, at length, every conceivable aspect of their dissolution, incurring hundreds of thousands of dollars in attorney fees in the process. Many of the interactions between the parties are detailed or recorded, so that any infraction, no matter how trivial, may be weaponized for future use. The voluminous record is filled with punitive motions. We reject James's suggestion that the trial court failed to appreciate each party's respective actions in this case or to assess their ability to foster a parent-child relationship.

¶ 137   Based on this court's review of the record, we believe the report of the GAL provided an accurate assessment of the parties' respective abilities to foster a parent-child relationship with the other parent. The GAL reported that Shannon had not demonstrated a "tremendous willingness" to facilitate a close relationship between S.A. and James. The GAL indicated that he believed Shannon had the ability to do so and that, but for James's actions against her, Shannon would be willing to facilitate the relationship.

¶ 138   The GAL, however, expressed the belief and concern that James was not just unable to foster a parent-child relationship between S.A. and Shannon, but that James was actively trying to "destroy it." The report provided detailed examples of the ongoing attempts by James to alienate S.A. from Shannon and his failure to appreciate that his actions are harmful and upsetting to S.A. This assessment by the GAL in May 2018 was consistent with the trial court's findings in the May 2013 judgment of dissolution of marriage. In awarding Shannon sole custody of S.A., the court found that all of the relevant factors favored awarding sole custody to Shannon, including that Shannon was more capable of facilitating and encouraging a parent-child relationship with the other parent. In rendering that judgment, the trial court found that James was actively attempting to alienate S.A. from Shannon, which included James telling S.A. that Shannon did not love S.A., and that James hoped Shannon would die so that he and S.A. could be happy.

47

¶ 139  Here, James's unwillingness to facilitate a parent-child relationship between S.A. and Shannon is well documented throughout the entirety of the proceedings, and far exceeds any unwillingness exhibited by Shannon. Based on the foregoing, we find the trial court's determination that James failed to demonstrate that a modification of the allocation of parental responsibilities was in S.A.'s best interests was not against the manifest weight of the evidence. Therefore, the trial court's July 27, 2020, order denying James's petition to modify custody is affirmed.

¶ 140                                    CONCLUSION

¶ 141  For the reasons set forth above, the trial court's October 20, 2014, March 24, 2015, and July 27, 2020, orders are affirmed.


¶ 142  Affirmed.